ACCEPTED
01-13-01068-CV
FIRST COURT OF APPEALS
HOUSTON, TEXAS
9/4/2015 4:09:30 PM
CHRISTOPHER PRINE
CLERK

## No. 01-13-01068-CV

IN THE COURT OF APPEALS
FOR THE FIRST DISTRICT OF TEXAS
AT HOUSTON

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS

9/4/2015 4:09:30 PM

CHRISTOPHER A. PRINE
Clerk

DIAMOND OFFSHORE SERVICES LIMITED AND
DIAMOND OFFSHORE SERVICES COMPANY,
*Appellants*,

**v.**

WILLIE DAVID WILLIAMS,
*Appellee.*

**Appeal from the 164th District Court of Harris County, Texas,
Trial Court Cause 2011-31922**

APPELLANTS' MOTION FOR EN BANC RECONSIDERATION

ADELE HEDGES,
ATTORNEY AT LAW PLLC
Adele O. Hedges
State Bar No. 09368500
ah@adelehedges.com
2719 Colquitt
Houston, TX  77098
(713) 702-4289

BECK REDDEN LLP
David M. Gunn
State Bar No. 08621600
dgunn@beckredden.com
Constance H. Pfeiffer
State Bar No. 24046627
cpfeiffer@beckredden.com
1221 McKinney, Suite 4500
Houston, TX  77010
(713) 951-3700
(713) 951-3720 (Fax)

COUNSEL FOR APPELLANTS

TABLE OF CONTENTS

PAGE

TABLE OF CONTENTS ...............................................................................i

INDEX OF AUTHORITIES................................................................... ii

ISSUE PRESENTED ON REHEARING...................................................1

EN BANC STANDARD ...........................................................................2

SUMMARY OF RELEVANT FACTS ......................................................2

ARGUMENT ...........................................................................................8

     I.     The Admissibility Analysis for Visual Evidence in Civil and Criminal Cases Should be Uniform. ...................................................8

          A.     Video surveillance evidence is routinely admitted under Rule 402. ..................................................9

          B.     Video surveillance evidence is rarely excluded under Rule 403. ....................................................12

          C.     Rule 403 provided no basis to exclude the video in this case. ....................................................14

PRAYER FOR RELIEF.............................................................................16

CERTIFICATE OF SERVICE....................................................................17

CERTIFICATE OF COMPLIANCE .............................................................18

APPENDIX

     Functional Capacity Evaluation (DX-28)...................................Tab A

     Jury Charge/Verdict.................................................................Tab B

     Trial Court Judgment...............................................................Tab C

     Court of Appeals Majority Opinion .........................................Tab D

     Court of Appeals Dissenting Opinion ......................................Tab E

# INDEX OF AUTHORITIES

**CASE**                                                                        **PAGE(S)**

*Baker v. Canadian National/Illinois Cent. R.R.*,
536 F.3d 357 (5th Cir. 2008) ...........................................................................10, 13

*Bay Area Healthcare Grp., Ltd. v. McShane*,
239 S.W.3d 231 (Tex. 2007) ..................................................................................13

*Brookshire Bros., Ltd. v. Aldridge*,
438 S.W.3d 9 (Tex. 2014)......................................................................................12

*Chiasson v. Zapata Gulf Marine Corp.*,
988 F.2d 513 (5th Cir. 1993) .................................................................................10

*Crist v. Goody*,
507 P.2d 478 (Colo. App. 1972)............................................................................10

*Dunn v. Bank-Tec South*,
134 S.W.3d 315 (Tex. App.—Amarillo
2003, no pet.) ..........................................................................................................9

*Flannery v. State*,
1999 WL 504183 (Tex. App.—Houston
[1st Dist.] 1999, pet. ref'd) ...................................................................................15

*Gordon v. State*,
784 S.W.2d 410 (Tex. Crim. App. 1990) .........................................................12, 15

*Graves v. State*,
01-07-00212-CR, 2008 WL 5263349
(Tex. App.—Houston [1st Dist.]
2008, pet. ref'd)....................................................................................................11

*Heiman v. Market Street Ry. Co.*,
69 P.2d 178 (Cal. Ct. App. 1937) ..........................................................................10

*Hernandez v. State*,
01-13-00467-CR, 2014 WL 4113095
(Tex. App.—Houston [1st Dist.]
2014, pet. ref'd)....................................................................................................11

*Home Ins. Co. v. Garcia*,
   74 S.W.3d 52 (Tex. App.—El Paso
   2002, no pet.) ................................................................................9

*Huston v. United Parcel Serv., Inc.*,
   434 S.W.3d 630 (Tex. App.—Houston
   [1st Dist.] 2014, pet. denied) .........................................................9

*James v. Carawan*,
   995 So.2d 69 (Miss. 2008)........................................................10, 13

*McDougal v. McCammon*,
   455 S.E.2d 788 (W.Va. 1995)........................................................11

*Moak v. Illinois Cent. R.R. Co.*,
   631 So.2d 401 (La. 1994) ..............................................................11

*Nat'l Freight, Inc. v. Snyder*,
   191 S.W.3d 416 (Tex. App.—Eastland
   2006, no pet.) .......................................................................9, 12, 13

*Samarkos v. Goddard*,
   2013 WL 2705964 (Cal. App. 2013)
   (unpublished) ...............................................................................13

*Santellan v. State*,
   939 S.W.2d 155 (Tex. Crim. App. 1997)
   (en banc)........................................................................................8

*Smith v. Diamond Offshore Drilling, Inc.*,
   168 F.R.D. 582 (S.D. Tex. 1996).................................................11

*Sweet v. Pace Membership Warehouse, Inc.*,
   795 A.2d 524 (R.I. 2002)..............................................................10

*Texas Capital Sec., Inc. v. Sandefer*,
   58 S.W.3d 760 (Tex. App.—Houston
   [1st Dist.] 2001, pet. denied) .......................................................13

*Wal-Mart Stores, Inc. v. Hoke*,
   2001 WL 931658 (Tex. App.—Houston
   [14th Dist.] 2001, no pet.).........................................................9, 14

iii

*Williams v. State*,
01-14-00395-CR, 2015 WL 4591683
(Tex. App.—Houston [1st Dist.]
July 30 2015, no. pet. h.)..................................................................................11

*Wolford v. JoEllen Smith Psychiatric Hosp.*,
693 So.2d 1164 (La. 1997) ...............................................................................11

*Zegarelli v. Hughes*,
814 N.E.2d 795 (N.Y. 2004)..............................................................................11

*Zimmerman v. Superior Court In & For Maricopa County*,
402 P.2d 212 (Ariz. 1965) (en banc) ................................................................10

**OTHER AUTHORITIES**

TEX. R. APP. P. 41.2 .................................................................................................2

TEX. R. EVID.
401.................................................................................................................9
402.............................................................................................................8, 9
403.........................................................................................................*passim*

## ISSUE PRESENTED ON REHEARING

This personal injury case involves an ordinary injury that resulted in an extraordinary verdict. Every element of the plaintiff's claims was hotly disputed, and the jury's verdict would have probably been different if the defendant had been permitted to use its best evidence. The Panel divided sharply over whether a ruling excluding surveillance video of the plaintiff was harmful error. Given the division among the Panel and the recurring nature of this issue, it warrants the full Court's attention.

Did the Majority create an unjustified schism between how civil and criminal courts determine the admissibility of visual evidence, and did it pave the way for the routine exclusion of surveillance videos in civil cases?

## EN BANC STANDARD

En banc consideration is appropriate when it is "necessary to secure or maintain uniformity of the court's decisions[.]" TEX. R. APP. P. 41.2. That standard is met here, because the Court's civil and criminal standards for the admissibility of surveillance video have diverged. Given that the analysis in both types of cases hinges on the same evidentiary rules, there is no reason to have differing standards.

## SUMMARY OF RELEVANT FACTS

The plaintiff in this personal injury case, David Williams, alleges he suffers extreme pain and mental anguish and can never work again.

A key dispute is whether Williams's injury is as debilitating as he claims. The defendants are two Diamond Offshore entities who do not deny that Williams has a herniated and a bulging disc in his back and may be unfit to return to his former job. But they have strong evidence to believe that Williams can work again and that his disabilities are overstated.

After a report concluded that Williams is fit for work and exaggerating his pain, Tab A (DX-28), Diamond Offshore hired an investigator. It wanted to see for itself what Williams can do in his unguarded moments. Through videotape of Williams on three consecutive days, it learned he could do quite a lot. *See* Defense Proffer No. 3 (one-hour videotape).

On one day the video shows Williams operating heavy equipment, unassisted. He moves freely about, tearing down a structure and loading scrap metal onto a truck—all while the equipment is vibrating heavily and obviously requiring some strength and physical effort to operate.







4

On another day, the video shows Williams working on the "monster tires" of his lifted truck. 5 RR 77. This footage tends to show that Williams, who had previously worked as a car mechanic, could still do this type of work. 6 RR 137.





Not only can Williams work, he can also play. While on medical leave (while Diamond Offshore was paying Williams his salary and medical expenses), Williams sent photos of himself deer hunting to his buddies on the rig. *See* Defense Proffer No. 2 (photos). Williams stood proudly next to a 120 pound doe.

During the pretrial hearing in this case, Williams preemptively sought to exclude all of Diamond Offshore's visual evidence and even its medical expert's opinions formed after viewing that evidence. Williams assured the trial court that he would admit he could do everything the videotape showed, such that putting the visual evidence before the jury would be improper impeachment.

The trial court ruled that Diamond Offshore could show the video to the jury only if Williams opened the door by denying things shown on tape:

> THE COURT: Here's what I'm gonna do. You can keep it in your reserve bank for impeachment, and that's it. So, if he opens the door, then we'll take a look at it.

2 RR 29.

The trial court did not view the video when making that ruling. 2 RR 25 ("Your Honor, I'm assuming you have never seen the video. THE COURT: No."). The trial court stood by this ruling each time the evidence was offered at trial. *See* 4 RR 182; 5 RR 82; 6 RR 6. The trial court also excluded Diamond Offshore's medical expert's opinion formed after he viewed the video. 6 RR 236-43.

Without the benefit of this evidence, the jury returned a verdict for Williams on everything he requested. Their damages awards totaled $9.6 million. Tab B (verdict). The trial judge, the Hon. Alexandra Smoots-Hogan, signed a judgment on the verdict. Tab C (judgment).

A panel of this Court divided on whether it was harmful error to exclude the surveillance video. The majority opinion, authored by Chief Justice Radack and joined by Justice Jennings, affirmed the trial court's decision to exclude the surveillance video, concluding that the trial judge could have determined the video was inadmissible under Rule 403. Tab D at 26 (majority opinion). Justice Keyes authored a dissenting opinion that explained why excluding the video was harmful error. Tab E (dissenting opinion).

**ARGUMENT**

The Texas Rules of Evidence ought to be reliable tools that work the same way in every type of case. Yet a panel of this Court has just created a schism between its civil and criminal dockets for the admissibility of surveillance video. To our knowledge, the Majority's opinion is the only one in Texas to uphold the exclusion of a surveillance video in its entirety. The full Court should reconsider this ruling.

**I.     The Admissibility Analysis for Visual Evidence in Civil and Criminal Cases Should be Uniform.**

This case is a referendum on whether the rules of evidence apply differently when visual evidence is offered by a civil defendant or against a criminal one. Gruesome autopsy photos are admissible against criminal defendants charged with murder. *See Santellan v. State*, 939 S.W.2d 155, 172-73 (Tex. Crim. App. 1997) (en banc) (affirming admission of "disturbing" photos over Rule 403 objection). Yet the Majority holds that ordinary video footage showing a personal injury plaintiff's physical abilities is properly excludable as too prejudicial in a civil trial.

The Majority found itself unaided by any "binding" authority and thus affirmed the trial court's ruling as an exercise of discretion. The binding authority is Rules of Evidence 402 and 403. Courts applying these rules routinely admit the exact type of evidence that was excluded in this case. The ruling excluding the evidence in this case cannot be rubber stamped as within the zone of discretion.

8

**A.      Video surveillance evidence is routinely admitted under Rule 402.**

Video surveillance evidence in a personal injury case is "relevant," as it tends to make disputed facts more or less probable.  TEX. R. EVID. 401 & 402. Surveillance videos are thus routinely admitted in Texas personal injury trials because they are relevant and substantive.[1]

This Court's *Huston* case is much like this one, involving a sharp dispute over liability and the severity and extent of back injuries.  But unlike Williams, Huston hardly hit the jackpot.  The jury returned a verdict in her favor for $96,000 —an order of magnitude less than the verdict in this case.

Like Diamond, UPS argued that the plaintiff's injuries were exaggerated and related to a prior injury and her degenerative disc disease.  UPS Br. 26.  But unlike Diamond, UPS was permitted to use its 20-minute surveillance video, which showed the plaintiff walking with no apparent distress.  UPS Br. 26.  On appeal, UPS lauded this evidence:  "Perhaps the most damaging evidence to Appellant's credibility was a surveillance video taken more than a year after the accident." *Id*.

The *Home Insurance Company* case is also much like this one, except the trial court admitted video surveillance evidence of the plaintiff—even though the plaintiff conceded he could perform the tasks it showed.  74 S.W.3d at 56-57.

---

[1]  *See Huston v. United Parcel Serv., Inc.*, 434 S.W.3d 630, 642 (Tex. App.—Houston [1st Dist.] 2014, pet. denied); *Wal-Mart Stores, Inc. v. Hoke*, 2001 WL 931658, *13 (Tex. App.—Houston [14th Dist.] 2001, no pet.); *Home Ins. Co. v. Garcia*, 74 S.W.3d 52, 56-57 (Tex. App.—El Paso 2002, no pet.); *Dunn v. Bank-Tec South*, 134 S.W.3d 315, 328-29 (Tex. App.—Amarillo 2003, no pet.); *Nat'l Freight, Inc. v. Snyder*, 191 S.W.3d 416, 424 (Tex. App.—Eastland 2006, no pet.).

The seminal Fifth Circuit case on surveillance evidence fully explains why such evidence is admissible not just for impeachment but also as substantive proof. *See Chiasson v. Zapata Gulf Marine Corp.*, 988 F.2d 513, 517 (5th Cir. 1993). A plaintiff's personal injury claims render surveillance evidence of her abilities substantive, because "the severity of her pain and the extent to which she has lost the enjoyment of normal activity are among the key issues a jury must decide in calculating her damages." *Id.*; *see also Baker v. Canadian National/Illinois Cent. R.R.*, 536 F.3d 357, 368-69 (5th Cir. 2008).

The highest court of Williams's home state has found the exclusion of surveillance evidence to be reversible error in a personal injury case. *See James v. Carawan*, 995 So.2d 69, 75-78 (Miss. 2008). Evidence that undoubtedly would have been admitted at trial if Williams had filed suit in his home state of Mississippi is just as admissible in Texas, where the analysis is the same.

Indeed, the admissibility of surveillance evidence as substantive evidence of personal injuries is accepted by courts from coast to coast.[2]

---

[2] On the West Coast, courts have long held surveillance evidence admissible: "Surveillance evidence and the like, although useful for impeachment purposes under certain circumstances, also contains substantive evidence relevant to the matters in litigation[.]" *Zimmerman v. Superior Court In & For Maricopa County*, 402 P.2d 212, 217 (Ariz. 1965) (en banc); *see also Heiman v. Market Street Ry. Co.*, 69 P.2d 178, 180-81 (Cal. Ct. App. 1937) (surveillance in the form of "moving pictures" properly admitted) (first video case); *Crist v. Goody*, 507 P.2d 478, 479-80 (Colo. App. 1972) ("We hold first that 'surveillance movies' are primarily substantive evidence and not totally or even basically impeachment evidence.").

On the East Coast, two high courts have reversed and remanded for new trials where surveillance videotapes were excluded. *See Sweet v. Pace Membership Warehouse, Inc.*, 795 A.2d 524, 527-29 (R.I. 2002) (excluding video surveillance of personal injuries was harmful

On the criminal side of the docket, Texas cases discussing surveillance video evidence are a dime a dozen. More than 60 criminal cases within the First and Fourteenth Courts of Appeals reference the admission of surveillance video in the context of criminal prosecutions. Surveillance videos come into evidence even where defendants admit to the crime[3] or where a witness is available to testify to the things captured on video.[4] The admission of surveillance videos is so common that a defendant has argued that the trial evidence was insufficient because there were "no eyewitnesses or surveillance videos placing him at the scene."[5]

---

error); *Zegarelli v. Hughes*, 814 N.E.2d 795, 798 (N.Y. 2004). A third high court has affirmed the admission of such evidence. *McDougal v. McCammon*, 455 S.E.2d 788, 795 (W.Va. 1995).

In the Gulf Coast, Louisiana's highest court has stated the relevance of surveillance video quite cogently: "When a plaintiff is claiming personal injury, a film, videotape or photograph taken surreptitiously of his activities by or at the direction of the adverse party is highly relevant with regard to the nature and extent of that injury and is likely to have a dramatic impact in court." *Moak v. Illinois Cent. R.R. Co.*, 631 So.2d 401, 404-05 (La. 1994) (discovery holding modified by *Wolford v. JoEllen Smith Psychiatric Hosp.*, 693 So.2d 1164 (La. 1997)).

The only debate about surveillance evidence concerns the timing of any pre-trial discovery. *E.g.*, *Smith v. Diamond Offshore Drilling, Inc.*, 168 F.R.D. 582, 586 (S.D. Tex. 1996). This is not an issue here.

[3] *See, e.g.*, *Hernandez v. State*, 01-13-00467-CR, 2014 WL 4113095, at *2 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd) (even though the defendant admitted that he stabbed the victim with a knife, the surveillance video showing this encounter was admitted into evidence and published to the jury).

[4] *See, e.g.*, *Graves v. State*, 01-07-00212-CR, 2008 WL 5263349, at *9 (Tex. App.—Houston [1st Dist.] 2008, pet. ref'd) ("The State presented the Coast Guard surveillance video along with the testimony [of the officer] responsible for security and surveillance around the Coast Guard facility.").

[5] *See, e.g.*, *Williams v. State*, 01-14-00395-CR, 2015 WL 4591683, at *6 (Tex. App.—Houston [1st Dist.] July 30 2015, no. pet. h.).

**B. Video surveillance evidence is rarely excluded under Rule 403.**

A Rule 403 balancing presumes that relevant evidence is admissible and asks whether the risk of unfair prejudice substantially outweighs probative value. Tex. R. Evid. 403. Video evidence usually has "substantial probative value." *Gordon v. State*, 784 S.W.2d 410, 413 (Tex. Crim. App. 1990) (seminal case discussing admissibility of videotapes). The Texas Supreme Court explains that "many of the inherent problems with [eyewitness] testimony—inaccurate memory, poor eyesight, bias, etc.—are simply not present with a video recording." *Brookshire Bros., Ltd. v. Aldridge*, 438 S.W.3d 9, 22 (Tex. 2014). The Texas Supreme Court twice observed in the context of surveillance video evidence that "a picture is worth a thousand words." *Id.* at 17, 22.

Unique circumstances may make a video properly excludable under Rule 403. For example, a trial court properly affirmed the exclusion of "a six second portion of [a] video depicting [the plaintiff] engaging in movements with his arm that appeared to be the simulation of an inappropriate act." *Nat'l Freight, Inc. v. Snyder*, 191 S.W.3d 416, 419-20, 424 (Tex. App.—Eastland 2006, no pet.). Though the trial court admitted the rest of the video, it properly excluded the 6-second portion because "many jurors likely would have been offended by [this portion of the video]" and "one of the remaining portion of the video [already] showed Snyder using both of his arms to pick up a large object." *Id.*

The *Snyder* decision illustrates that the "unfair prejudice" contemplated by Rule 403 is "an undue tendency to suggest a decision on an improper basis, commonly, though not necessarily, an emotional one." *Id*. at 424; *see also Bay Area Healthcare Grp., Ltd. v. McShane*, 239 S.W.3d 231, 234 (Tex. 2007); *Texas Capital Sec., Inc. v. Sandefer*, 58 S.W.3d 760, 779 (Tex. App.—Houston [1st Dist.] 2001, pet. denied). Under this definition of "unfair prejudice," courts routinely uphold the admission of surveillance evidence in personal injury cases despite Rule 403 objections.[6]

By contrast, imagine visual evidence showing a person's gang tattoos, or leaving a disreputable business establishment, or kicking his dog. Jurors might not look past these irrelevant and potentially emotional facts, which is precisely what would make the risk of prejudice unfair.

Other than the 6-second portion of surveillance video excluded in *Snyder*, we are unaware of any Texas case analyzing the exclusion of surveillance video. If left intact, the Majority's decision will become the seminal case in Texas discussing the exclusion of an entire surveillance video in a personal injury trial.

---

[6] *See, e.g.*, *Baker v. Canadian National/Illinois Cent. R.R.*, 536 F.3d 357, 369 (5th Cir. 2008) (Owen, J.) (holding surveillance evidence not unfairly prejudicial in personal injury cases; "Unfair prejudice is not satisfied by evidence that is 'merely adverse to the opposing party.'"); *James v. Carawan*, 995 So.2d 69, 78 (Miss. 2008) ("Aside from its damaging effect to [plaintiff's] case, we are unable to determine how [admission of video surveillance evidence] would unfairly prejudice [plaintiff]."); *Samarkos v. Goddard*, 2013 WL 2705964, *6 (Cal. App. 2013) (unpublished) (holding video surveillance evidence depicting a personal injury plaintiff's daily living was not unfairly prejudicial; "prejudice" in the rules of evidence means "prejudging a person or cause based on extraneous factors").

## C.    Rule 403 provided no basis to exclude the video in this case.

The Majority held that the trial court could have determined that the risk of unfair prejudice outweighed the surveillance video's probative value because it "created an impression that Williams could engage in physical activity for long periods of time without needing rest and without apparent pain." Op. at 26.

It is true that the video demonstrates that Williams can walk normally and withstand physical activity without limping, wincing, or showing other visual manifestations of pain. That this might have "created an impression" that Williams is exaggerating is precisely why it was offered. "The obvious purpose of these tapes [i]s to provide the jury with evidence [the plaintiff's] injuries were not very serious." *Wal-Mart Stores, Inc. v. Hoke*, 14-99-00503-CV, 2001 WL 931658, at *13 (Tex. App.—Houston [14th Dist.] 2001, no pet.) (mem. op.).

A surveillance video is *not* unfairly prejudicial simply because it does not capture events favorable to both sides. The truth seeking mission of a trial permits *both* parties to put on their best evidence. Only with a full and fair evidentiary fight can the jury discern which evidence to credit. The Majority erred by embracing a rationale that renders surveillance videos excludable in *all* personal injury cases, as plaintiffs can always think of something that the video does not show.

14

Further, in criminal cases, trial courts must view the videotape in order to determine its probative value and determine the risk of unfair prejudice. *Gordon v. State*, 784 S.W.2d 410, 412 (Tex. Crim. App. 1990) (a Rule 403 balancing "must be made by the trial court after viewing the tape"); *Flannery v. State*, 1999 WL 504183, at *2 (Tex. App.—Houston [1st Dist.] 1999, pet. ref'd) ("After watching the videotape outside the jury's presence, the trial judge determined that it was 'very probative.'")

Yet the Majority implicitly holds that the same balancing does not apply to the admissibility of visual evidence in civil cases. In this case, the trial court ruled that the visual evidence is admissible only for impeachment purposes—if the plaintiff denied what it shows, and on this basis it did not view the videotape to perform a Rule 403 balancing. 2 RR 29. The Majority nevertheless concludes that Rule 403 could have been a basis to exclude the videotape in its entirety. Op. at 26. Such a holding paves the way for arbitrary and capricious exclusionary rulings any time a plaintiff prefers that a jury not see the defendant's visual evidence.

The full Court should hold that a Rule 403 balancing cannot be done blindly. It should further hold that, in this case, there is nothing unfairly prejudicial about the evidence that substantially outweighs its probative value. It was harmful error to exclude Diamond Offshore's visual evidence in its entirety.

## PRAYER FOR RELIEF

The en banc Court should grant review, reverse the judgment and remand for a new trial.

Respectfully submitted,

BECK REDDEN LLP

By:/s/ *Constance H. Pfeiffer*
    David M. Gunn
    State Bar No. 08621600
    dgunn@beckredden.com
    Constance H. Pfeiffer
    State Bar No. 24046627
    cpfeiffer@beckredden.com
1221 McKinney, Suite 4500
Houston, TX 77010
(713) 951-3700
(713) 951-3720 (Fax)

Adele Hedges
ADELE HEDGES, ATTORNEY AT LAW, PLLC
State Bar No. 09368500
ah@adelehedges.com
2719 Colquitt
Houston, TX 77098
(713) 702-4289

**ATTORNEYS FOR APPELLANTS**

16

## CERTIFICATE OF SERVICE

I hereby certify that on September 4, 2015, a true and correct copy of the above and foregoing Motion for En Banc Reconsideration was forwarded to all counsel of record by the Electronic Filing Service Provider as follows:

Jeff Oldham
BRACEWELL & GIULIANI, LLP
711 Louisiana Street, Suite 2300
Houston, TX 77002-2770
jeff.oldham@bgllp.com

Michael Patrick Doyle
DOYLE LLP
2402 Dunlavy Street, Suite 200
Houston, TX 77006
mdoyle@doylelawfirm.com

Walter Z. Steinman
LAW OFFICES OF WALTER Z. STEINMAN
400 Greenwood Avenue
Wyncote, PA 19095
wsteinman@steinmanlaw.com

**Counsel for Appellee Willie David Williams**

*/s/ Constance H. Pfeiffer*
Constance H. Pfeiffer

**CERTIFICATE OF COMPLIANCE**

1. This brief complies with the type-volume limitation of Tex. R. App. P. 9.4 because it contains 3,056 words, excluding the parts of the brief exempted by Tex. R. App. P. 9.4.

2. This brief complies with the typeface requirements of Tex. R. App. P. 9.4(e) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in 14 point Times New Roman font.

Dated: <u>September 4, 2015</u>.


<u>*/s/ Constance H. Pfeiffer*</u>
Constance H. Pfeiffer
*Counsel for Appellants*

No. 01-13-01068-CV

IN THE COURT OF APPEALS
FOR THE FIRST DISTRICT OF TEXAS
AT HOUSTON

DIAMOND OFFSHORE SERVICES LIMITED AND
DIAMOND OFFSHORE SERVICES COMPANY,
*Appellants*,
v.

WILLIE DAVID WILLIAMS,
*Appellee.*

Appeal from the 164th District Court of Harris County, Texas,
Trial Court Cause 2011-31922

APPENDIX TO
MOTION FOR EN BANC RECONSIDERATION

**T**AB

A    Functional Capacity Evaluation (DX-28)

B    Jury Charge/Verdict

C    Trial Court Judgment

D    Court of Appeals Majority Opinion

E    Court of Appeals Dissenting Opinion

# Tab A
## Functional Capacity Evaluation
## (DX-28)

STATE OF MISSISSIPPI     §

COUNTY OF _Hinds_      §

## AFFIDAVIT

Medical Records Pertaining To:     **WILLIE DAVID WILLIAMS**
Date of Birth:          **02/14/1969**
Social Security Number:

**BEFORE ME,** _Dana Blair_ _____ (NOTARY), the undersigned authority, personally appeared _Louanne Chandler_ (AFFIANT), who, being by me duly sworn, deposed as follows:

My name is _____ (AFFIANT). I am of sound mind, capable of making this Affidavit, and personally acquainted with the facts herein stated:

I am a custodian of the medical records for **Medicomp Physical Therapy**. Attached hereto are _____7_____ pages from the medical records of **Medicomp Physical Therapy**. These said _____7_____ pages of records are kept by **Medicomp Physical Therapy** in the regular course of business, and it was the regular course of business of an employee or representative of **Medicomp Physical Therapy**, with knowledge of the act, event, condition, opinion or diagnosis, recorded to make the record or to transmit information thereof to be included in such record; and the record was made at or near the time or reasonably soon thereafter. The records attached hereto are the original or exact duplicates of the originals.

Further, Affiant sayeth not.

_Louanne Chandler_
AFFIANT

SUBSCRIBED AND SWORN TO BEFORE ME on this the _12_ day of _Oct_ _____, 2012.

_Dana Blair_
**NOTARY PUBLIC IN AND FOR THE STATE OF MISSISSIPPI**

STATE OF MISSISSIPPI
NOTARY PUBLIC
ID # 50453
DANA BLAIR
Commission Expires
June 7, 2013
RANKIN COUNTY

EXHIBIT
**D-28**

MED 0629



**Medicomp Physical Therapy/Jackson**
**1054 Greymont Avenue**
**Jackson, MS 39202**



*na: 7/22/11*

*'We do not do FCE Tests*

## Summary Report

| | |
|---|---|
| **Name:** | Willie "David" Williams |
| **Test Dates:** | July 7th, 2011 |
| **Gender:** | Male |
| **Date of Birth:** | 2/14/1969 |
| **Physician:** | Dr. Pat Barrett |
| **Date of Injury:** | December 2007 |
| **Medical History:** | Reviewed in chart by PT, hx of discectomy and fusion. |
| **Employer:** | Diamond Offshore |
| **Primary Diagnosis:** | Back pain |

## Reason for Testing:
- Determine physical abilities.

## Description of Test Done:
- One-Day Core WorkWell FCE

## Effort and Cooperation:
- Client patterns of movement and physiological responses consistent with maximal effort.
- Client demonstrated cooperative behavior and was willing to work to maximum abilities in all test items

## Consistency of Performance:
- Client gave maximal effort on all test items as evidenced by predictable patterns of movement including increased accessory muscle recruitment, counterbalancing and use of momentum, and physiological responses such as increased heart rate.
- Functional limitations noted are consistent with physical impairments and diagnosis

## Pain Report:
- Client reported discomfort present in lower back during material handling tasks, but there was no interference in safety.

MED 0477

**Safety:**
- Client demonstrated safe performance using appropriate body mechanics, throughout all subtests.

**Quality of Movement:**
- Client demonstrated safe and appropriate changes in body mechanics, including use of accessory muscles, counterbalancing, and momentum, as load/force increased. These changes are expected and consistent with maximal effort.

**Abilities/Strengths:**
- The client demonstrates the ability to tolerate material handling tasks in the lower end of the MEDIUM physical demand level.

**Limitations:**
- The client does have limitations with bending for long periods of time, standing, and antalgic gait.

**Potential Barriers to Return to Work:**
- Unable to fully assess ability to return to work as validated job description was not available, verbal reports from client/supervisor were used.

**Physical Return to Work Options Explored:**
- The large discrepancy between client abilities and self reported job demands may indicate limited success of rehabilitation to prior level of function. Alternative placement may be the most feasible plan.

**Therapist's Recommendations Regarding Return to Work:**
- Although job descriptions was not obtained, based on supervisor and/or client report there is not a job match.

**Summary/Recommendations:**
- These projections are for 8 hours per day/40 hours per week at the levels indicated on the FCE under basic ergonomic conditions.

**US Dept of Labor Physical Demand Level:**
- MEDIUM

MED 0478

**WorkWell FCE Physical Exam**

**Systems Review**

Blood Pressure: 149/99

Heart Rate (resting): 72

Height: 5'11"

Weight: 240 lbs.

Gait: mild antalgic gait

Posture: Unremarkable.

Coordination: unremarkable

Movement Characteristics: slow with sit to stand

Atrophy/Edema: none observed.

Integumentary: unremarkable

Muscle Tone Spasms: unremarkable

**Musculoskeletal System**

| Trunk | Normal | Range of Motion |
|-------|--------|-----------------|
| Flexion | 80 | Mod loss |
| Extension | 30 | Major loss |
| Right Lateral Flexion | 35 | Mod loss |
| Left Lateral Flexion | 35 | Mod loss |
| Right Rotation | 45 | Mod loss |
| Left Rotation | 45 | Mod loss |

**Comments/Quality of Motion- Spine:**
- Cervical ROM WNL
- Most dysfunction is with standing trunk extension.

**Comments/Quality of Motion- Upper Quarter:**
- Shoulder/elbow/wrist/hand ROM and strength WNL.

**Comments/Quality of Motion- Lower Extremity:**
- Hip ROM WFL, although there is a limitation with internal rotation (0 degrees bilaterally). Strength WNL.
- Knee, ankle ROM and strength WNL.

**Neuromuscular System**
Sensory Testing: unremarkable
Reflex Ankle Jerk: NA
Reflex Knee Jerk: NA
Reflex Upper Extremities: NA

**Balance**
- SLS each leg was >10 seconds.

**First Day Summary of Physical Assessment:**
- Gross limitation with trunk ROM, decreased tolerance to extension.
- Modified Oswestry Pain Questionnaire: 90%. This score is consistent with patients that are either bed bound or exaggerating their symptoms. This score is not consistent with what the client was able to do during the FCE. The client's perception of abilities is less than what he is capable of doing.

# WorkWell FCE Test Results and Interpretation

The interpretation of WorkWell's standardized functional testing is based on assumptions including normal breaks, basic ergonomic conditions and that the tested functions are usually not required more than 2/3 of a normal working day. If a function is required continuously, job related testing should be performed.

Interpretation of observed function regarding activity during a normal working day

| Frequency | Weighted Activities Observed Effort Level | Position/Ambulation Quantitative + Qualitative Results | % of Workday |
|---|---|---|---|
| NEVER | Contraindicated | Not Possible | 0% |
| RARELY | Maximum | Significant Limitation | 1-5% |
| OCCASIONALLY | Heavy | Some Limitation | 6-33% |
| FREQUENTLY | Low | Slight/No Limitation | 34-66% |
| SELF LIMITED | Client stopped test; submaximum effort level | | Submax % |

| Lifting, Strength (lbs) | Unable | Max. | Heavy | Low | Limitations | Recommendations |
|---|---|---|---|---|---|---|
| Waist to Floor (11") | | 30# | 25# | 0# | Limited standing tolerance. | |
| Waist to Crown (Hands at Handles) | | 30# | 25# | 0# | Limited standing tolerance and overhead work tolerance. | |
| Waist to Crown (Preferred Method) | | 30# | 25# | 0# | Limited standing tolerance and overhead work tolerance. | |
| Front Carry (Long) | | 35# | 30# | 0# | Antalgic gait. | |
| Right Carry | | 30# | 25# | 0# | Antalgic gait. | |

| Push-Pull (Static) | Force Generated | Limitations | Recommendations |
|---|---|---|---|
| Push Static | 150# | | |
| Pull Static | 175# | | |

(There are numerous variables impacting Push/Pull including load, equipment, surface, etc. This is not meant to indicate the "weight that is moved".)

| Posture, Flexibility, Ambulation | Unable | Significant Limitation | Some Limitation | Slight/No Limitation | Limitations | Recommendations |
|---|---|---|---|---|---|---|
| Elevated Work (Unweighted) | | | X | | Deltoid fatigue. | |
| Fwd Bend Standing | | | X | | Paraspinal fatigue; limited standing tolerance. | |
| Sitting | | | | X | | |
| Standing Work | | | X | | Increased trunk flexion with prolonged standing. | |
| Walking- 6MWT | | | X | | Antalgic gait pattern. | |
| Crouch | | | X | | Loss of neutral spine. | |
| Kneeling / Half Kneeling | | | X | | LE fatigue. | |
| Stairs | | | X | | Antalgic gait; excessive use of rails. | |
| Step Ladder- Two Handed | | | X | | Excessive use UE pulling. | |

MED 0481



**Summary Table**     **Patient: Willie David Williams**
**DOB: 2/14/1969**

| Lifting, Strength (lbs) | Rarely (1-5%) | Occasionally (6-33%) | Frequently (34-66%) |
|---|---|---|---|
| Waist to Floor (11") | 30# | 25# | 0# |
| Waist to Crown (Hands at Handles) | 30# | 25# | 0# |
| Waist to Crown (Preferred Method) | 30# | 25# | 0# |
| Front Carry (Long) | 35# | 30# | 0# |
| Right Carry | 30# | 25# | 0# |

| Push-Pull (Static) | Force Generated |
|---|---|
| Push Static | 150# |
| Pull Static | 175# |

| Posture, Flexibility, Ambulation | |
|---|---|
| Elevated Work (Unweighted) | Occasionally |
| Fwd Bend Standing | Occasionally |
| Sitting | Frequently |
| Standing Work | Occasionally |
| Walking- 6MWT | Occasionally |
| Crouch | Occasionally |
| Kneeling/Half-kneeling | Occasionally |
| Stairs | Occasionally |
| Step Ladder- Two Handed | Occasionally |

**Physical Demand Level: MEDIUM**

MED 0482

| Hand/Finger Strength | Force Generated (pounds) |
|---|---|
| Hand Grip Right | 111# |
| Hand Grip Left | 125# |

| Coordination | Number Completed | Percentile | Limitation | Recommendations |
|---|---|---|---|---|
| Purdue Pegboard Right | 15 | 28th | | |
| Purdue Pegboard Left | 14 | 14th | | |
| Purdue Pegboard Assembly | 18 | <1st | | |

| Coordination | Standard Score | Rating | Limitation | Recommendations |
|---|---|---|---|---|
| PCE Round Blocks Dominant Hand | 86 | Avg. | | |
| PCE Round Blocks NonDominant Hand | 84 | Avg. | | |

Signature: _____
Hamp Gaston, PT

Date: _7- 12 - 2011_

MED 0483

# Tab B
## Jury Charge/Verdict
## (CR 232-47)

COURT COPY
OFFICIAL



*P16*

Cause No. 2011-31922

| | | |
|---|---|---|
| WILLIE DAVID WILLIAMS | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | HARRIS COUNTY, |
| | § | |
| | § | |
| DIAMOND OFFSHORE SERVICES LIMITED | § | |
| and | § | |
| DIAMOND OFFSHORE SERVICES | § | 164th JUDICIAL DISTRICT |
| COMPANY | § | |
| Defendants. | § | |

**LADIES AND GENTLEMEN OF THE JURY:**

This case is submitted to you by asking you questions about the facts, which you must decide from the evidence you have heard in this trial. You are the sole judges of the credibility of the witnesses and the weight to be given their testimony, but in matters of law, you must be governed by the instructions in this charge. In discharging your responsibility on this jury, you will observe all the instructions which have previously been given you. I shall now give you additional instructions which you should carefully and strictly follow during your deliberations.

1. Do not let bias, prejudice or sympathy play any part in your deliberations.

2. In arriving at your answers, consider only the evidence introduced here under oath and such exhibits, if any, as have been introduced for your consideration under the rulings of the Court, that is, what you have seen and heard in this courtroom together with the law as given you by the Court. In your deliberations, you will not consider or discuss anything that is not represented by the evidence in this case.

3. Since every answer required by the charge is important, no juror should state or consider that any required answer is not important.

4. You must not decide who you think should win, and then try to answer the questions accordingly. Simply answer the questions and do not discuss nor concern yourselves with the effect of your answers.

I

232

5. You will not decide an issue by lot or by drawing straws, or by any other method of chance. Do not return a quotient verdict. A quotient verdict means that the jurors agree to abide by the result to be reached by adding together each juror's figures and then dividing by the number of jurors to get an average. Do not do any trading on your answers--that is, one juror should not agree to answer a certain question in a certain way in exchange for another juror answering another question in a certain way.

6. You may render your verdict on the vote of ten (10) or more members of the jury. The same ten (10) or more of you must agree upon all of the answers made and also agree as to the entire verdict. You will not, therefore, enter into an agreement to be bound by a majority or any other vote of less than ten (10) jurors. If the verdict and all answers therein are reached by unanimous agreement, the presiding juror shall sign the verdict for the entire jury. If any juror disagrees as to any answer made by the verdict, those jurors who agree as to all findings shall each sign the verdict.

These instructions are given to you because your conduct is subject to review the same as that of the witnesses, parties, attorney and the Judge. If it should be found that you have disregarded any of these instructions, it will be jury misconduct and it may require another trial by another jury; then all of our time will have been wasted.

The presiding juror or any other who observes a violation of the Court's instructions shall immediately warn the one who is violating the same and caution the juror not to do so again.

When the words are used in this charge in a sense which varies from the meaning commonly understood, you are given a proper legal definition, which you are bound to accept in place of any other meaning.

Answer "Yes" or "No" to all questions unless otherwise instructed. A "Yes" answer must be based upon a preponderance of the evidence, unless otherwise instructed. If you do not find that a preponderance of the evidence supports a "Yes" answer, then answer "No." The term "PREPONDERANCE OF THE EVIDENCE" means the greater weight and degree of credible testimony or evidence introduced before you and admitted in this case. Whenever a question requires an answer other than a "Yes" or "No" answer, your answer must be based upon a preponderance of the evidence unless otherwise instructed.

A fact may be established by direct evidence or by circumstantial evidence or both. A fact is established by direct evidence when proved by documentary evidence or by witnesses who saw the act done or heard the words spoken. A fact is established by circumstantial evidence when it may be fairly and reasonably inferred from other facts

2

provided.

In answering questions about damages, answer each question separately. Do not increase or reduce the amount in one answer because of your answer to any other question about damages. Do not speculate about what any party's ultimate recovery may or may not be. Any recovery will be determined by the court when it applies the law to your answers at the time of judgment. Do not add any amount for interest or damages, if any.

Deposition testimony consists of the sworn testimony of witnesses taken by a court reporter in the presence of attorneys for the parties. Deposition testimony read into evidence during the trial or presented by videotape is to be considered by you in the same manner as though the witness had personally appeared before you and testified from the witness stand.

The plaintiff, Willie David Williams, a seaman, is asserting two separate claims against the Defendants, Diamond Offshore Services Limited and Diamond Offshore Services Company. The plaintiff's first claim, under a federal law known as the Jones Act, is that his employer, Diamond Offshore Services Limited was negligent, and that its negligence was the cause of his injuries. The plaintiff's second claim is that unseaworthiness of their vessel called OCEAN LEXINGTON, owned by Diamond Offshore Services Company, caused his injuries.

You must consider each of these claims separately. The plaintiff is not required to prove both of these claims. He may recover if he proves either one of them. However, he may only recover those damages or benefits that the law provides for the particular claims that he proves; he may not recover the exact same damages or benefits more than once.

Not every injury that follows an accident necessarily results from it. The accident must be the cause of the injury.

In determining causation, different rules apply to the Jones Act Claim and to the unseaworthiness claim.

Under the Jones Act, for both the employer's negligence and the plaintiff's contributory negligence, an injury or damage is considered caused by an act, or failure to act, if the act or omission brought about or actually caused the injury or damage, in whole or in part.

In an unseaworthiness claim, the plaintiff must show, not merely that the

3

unseaworthy condition was a cause of the injury but that such condition was a proximate cause of it. This means that the plaintiff must show that the condition in question was a substantial factor in bringing about or actually causing his injury, and that the injury was either a direct or reasonably probable consequence of the condition.

4

## Question 1
## JONES ACT – NEGLIGENCE

Under the Jones Act, the plaintiff, Willie David Williams, must prove that his employer, Diamond Offshore, was negligent. Negligence is the doing of an act that a reasonably prudent person would not do, or the failure to do something that a reasonably prudent person would do, under the same or similar circumstances. The occurrence of an accident, standing alone, does not mean anyone's negligence caused the accident.

In a Jones Act claim, the word "negligence" is given a liberal interpretation. It includes any breach of duty that an employer owes to his employees who are seamen, including the duty of providing for the safety of the crew.

Under the Jones Act, if Diamond Offshore's negligent act or acts caused the plaintiff's injury, in whole or in part, then you must find that the employer is liable under the Jones Act.

Negligence under the Jones Act may consist of a failure to comply with a duty required by law. Employers of seamen have a duty to provide their employees with a reasonably safe place to work. If you find that the plaintiff was injured because the defendants failed to furnish him with a reasonably safe place to work, and that the plaintiff's working conditions could have been made safe through the exercise of reasonable care, then you must find that the defendants were negligent.

The fact that Diamond Offshore conducted its operations in a manner similar to that of other companies is not conclusive as to whether the defendants were negligent or not.

You must determine if the operation in question was reasonably safe under the circumstances. The fact that a certain practice has been continued for a long period of time does not necessarily mean that it is reasonably safe under all circumstances. A long accepted practice may be an unsafe practice. However, a practice is not necessarily unsafe or unreasonable merely because it injures someone.

A seaman's employer is legally responsible for the negligence of one of his employees while that employee is acting within the course and scope of his employment.

5

236

Do you find that Diamond Offshore was negligent and that such negligence was a cause, in whole or in part, of Willie David Williams' injuries?

Answer "Yes" or "No":       YeS

6

237

## Question 2
## UNSEAWORTHINESS

The plaintiff, Willie David Williams, seeks damages for personal injury that he claims was caused by the unseaworthiness of the defendant's vessel, the OCEAN LEXINGTON.

A vessel owner owes to every member of the crew employed on its vessel the absolute duty to keep and maintain the vessel, and all deck and passageways, appliances, gear, tools, parts and equipment of the vessel in a seaworthy condition at all times.

A seaworthy vessel is one that is reasonably fit for its intended use. The duty to provide a seaworthy vessel is absolute because the owner may not delegate that duty to anyone. Liability for an unseaworthy condition does not in any way depend upon negligence or fault or blame. If an owner does not provide a seaworthy vessel—a vessel that is reasonably fit for its intended use—no amount of care of prudence excuses the owner.

The duty to provide a seaworthy vessel includes a duty to supply an adequate and competent crew.

However, the owner of a vessel is not required to furnish an accident free ship. He need only furnish a vessel and its appurtenances that are reasonably fit for their intended use and a crew that is reasonably adequate for their assigned tasks.

The vessel owner is not required to provide the best appliances and equipment, or the finest of crews, on his vessel. He is only required to provide a gear that is reasonably proper and suitable for its intended use, and a crew that is reasonably adequate.

In summary, if you find that the owner of the vessel, Diamond Offshore, did not provide an adequate crew, or if you find that the vessel was in any manner unfit in accordance with the law as I have just explained it to you and that this was proximate cause of the injury, a term I will explain to you, then you may find that the vessel was unseaworthy and the ship owner liable, without considering any negligence on the part of the defendant or any of its employees.

However, if you find that the owner had a capable crew and appliances and gear that were safe and suitable for their intended use, then the vessel was not unseaworthy

7

238

and the defendant is not liable to the plaintiff on the claim of unseaworthiness.

Do you find that Diamond Offshore failed to furnish a seaworthy vessel and that the unseaworthy condition of the vessel played a substantial part in bringing about Willie David Williams' injuries?

Answer "Yes" or "No": _____Yes_____

8

**If you answered "Yes" to Questions 1 or 2, then answer Question 3. If not, you should not answer any other Questions.**

## Question 3
## CONTRIBUTORY NEGLIGENCE

The Defendants contend that the Plaintiff, Willie David Williams, was negligent, and that the Plaintiff's negligence, caused or contributed to causing his injury. This is the defense of "contributory negligence". Defendants have the burden of proving that Willie David Williams, was contributorily negligent. If Plaintiff's negligence contributed to his injury, he nevertheless may recover if he shows that Defendants were also negligent and liable. However, the amount of his recovery will be reduced by the extent of his contributory negligence.

A seaman is obligated under the Jones Act to act with ordinary prudence under the circumstances. The circumstances of a seaman's employment include not only his reliance on his employer to provide a safe work environment, but also his own experiences, training, and education. In other words, under the Jones Act a seaman like Willie David Williams has the duty to exercise that degree of care for his own safety that a reasonable seaman would exercise in like circumstances.

If you find that the Defendants were negligent or that the vessel was unseaworthy and the negligence or unseaworthiness was the proximate or legal cause of Willie David Williams, but you also find that the accident was due partly to the contributory negligence of Willie David Williams, then you must determine the percentage that Willie David Williams' negligence contributed to the accident. Do not make any reduction in the amount of damages that you award to the plaintiff. I will reduce the damages that you award by the percentage of contributory negligence that you assign to plaintiff.

Do you find that Willie David Williams was negligent and that such negligence was a cause, in whole or in part, of his injuries?

Answer "Yes" or "No":     ___Yes___

9

240

For each party that you found liable in answer to Questions 1, 2, or 3, what percentage of the negligence and/or unseaworthiness do you attribute to each person or entity named below?

Your total should equal 100%, and you should answer in whole numbers only. If you do not find a party to be at fault, enter a zero (0) in the column next to the appropriate name.

**Question 4**

Diamond Offshore                              _____30_____ %

OCEAN LEXINGTON (the vessel)      _____60_____ %

Willie David Williams                          _____10_____ %

10

241

## Question No. 5
## DAMAGES

If you find that a defendant is liable, you must award the amount you find by a preponderance of the evidence as full and just compensation for all of the plaintiff's damages. Compensatory damages are not allowed as a punishment against a party. Such damages cannot be based on speculation, for it is only actual damages - what the law calls compensatory damages - that are recoverable. However, compensatory damages are not restricted to actual loss of time or money; they include both the mental and physical aspects of injury, tangible and intangible. They are an attempt to make the plaintiff whole, or to restore him to the position he would have been in if the accident had not happened.

You should consider the following elements of damages, to the extent you find that the plaintiff has established such damages by a preponderance of the evidence; physical pain and suffering including physical disability, impairment, and inconvenience, and the effect of the plaintiff's injuries and inconvenience on the normal pursuits and pleasures of life; mental anguish and feelings of economic insecurity caused by disability; income loss in the past; impairment of earning capacity or ability in the future, including impairment in the normal progress in the plaintiff's earning capacity due to his physical condition; the reasonable value, not exceeding actual cost to the plaintiff, of medical and life care that you find from the evidence will be reasonably certain to be required in the future as a proximate result of the injury in question.

Some of the damages, such as mental or physical pain and suffering, are intangible things about which no evidence of value is required. In awarding these damages, you are not determining value, but you should award an amount that will fairly compensate the plaintiff for his injuries.

Any award you make to the plaintiff is not subject to income tax; neither the state nor the federal government will tax it. Therefore, you should determine the amount that plaintiff is entitled to receive without considering the effect of taxes upon it.

You may not award damages for any injury or condition from which the plaintiffs may have suffered, or may now be suffering, unless it has been proved by a preponderance of the evidence that the accident proximately or directly caused such injury or condition.

If you find that the plaintiff is entitled to an award of damages for loss of future earnings, there are two particular factors you must consider. First, you should consider loss after income taxes; that is, you should determine the actual or net income that

11

242

plaintiff has lost or will lose, taking into consideration that any past or future earnings would be subject to income taxes. You must award the plaintiff only his net earnings after tax. This is so because any award you may make here is not subject to income tax. The federal or state government will not tax any amount which you award on this basis.

Second, an amount to cover a future loss of earnings is more valuable to the plaintiff if he received the amount today than if he received the same amount in the future. Therefore, if you decide to award plaintiff an amount for lost future earnings, you must discount it to present value by considering what return would be realized on a relatively risk free investment.

You may award damages for any bodily injury that the plaintiff sustained and any pain and suffering, disability, disfigurement, mental anguish, and/or loss of capacity for enjoyment of life that the plaintiff experienced in the past or will experience in the future as a result of the bodily injury. No evidence of the value of intangible things, such as mental or physical pain and suffering, has been or need be introduce. You are not trying to determine value, but an amount that will fairly compensate the plaintiff for the damages he has suffered. There is no exact standard for fixing the compensation to be awarded for these elements of damage. Any award that you make should be fair in the light of the evidence.

You may award damages for aggravation of an existing disease or physical defect resulting from physical injury to the plaintiff. If you find that there was such an aggravation, you should determine, if you can, what portion of the plaintiff's condition resulted from the aggravation, and make allowance in your verdict only for the aggravation.

Future medical expenses include the reasonable value of the expense of hospitalization, medical, and nursing care and treatment that the plaintiff will require in the future because of his injuries which were caused by the defendants' wrongful conduct.

A person who claims damages resulting from the wrongful act of another has a duty under the law to use reasonable diligence to mitigate – to avoid or minimize those damages.

If you find the defendant is liable and the plaintiff has suffered damages, the plaintiff may not recover for any item of damages which he could have avoided through reasonable effort. If you find by a preponderance of the evidence the plaintiff unreasonably failed to take advantage of an opportunity to lessen his damages, you should deny him recovery for those damages which he would have avoided had he

12

243

taken advantage of the opportunity.

You are the sole judge of whether the plaintiff acted reasonably in avoiding or minimizing his damages. An injured plaintiff may not sit idly by when presented with an opportunity to reduce his damages. However, he is not required to exercise unreasonable efforts or incur unreasonable expenses in mitigating the damages. The defendant has a burden of proving the damage which the plaintiff could have mitigated. In deciding whether to reduce the plaintiff's damages because of his failure to mitigate, you must weigh all the evidence in light of the particular circumstances of the case, using sound discretion in deciding whether the defendant has satisfied his burden of proving that the plaintiff's conduct was not reasonable.

State the amount of damages, if any, you award Plaintiff Willie David Williams for each of the items:

Answer separately, in dollars and cents, for damages, if any.

a.   Physical pain and mental anguish sustained in the past.

Answer: $ 500,000.00   Thousand

b.   Physical pain and mental anguish that, in reasonable probability, David Williams will sustain in the future.

Answer: $ 3.4 million

c.   Loss of earning capacity sustained in the past.

Answer: $ 557,793.000 Thousand

d.   Loss of earning capacity that, in reasonable probability, David Williams will sustain in the future.

Answer: $ 2,254.275⁰⁰ million

e.   Physical impairment sustained in the past.

Answer: $ 250,000   Thousand

13

f.    Physical impairment that, in reasonable probability, David Williams will sustain in the future.

Answer: $ _____ 1.1 million_____

g.    Disfigurement sustained in the past.

Answer: $ 250,000 00 Thousand

h.    Disfigurement that, in reasonable probability, David Williams will sustain in the future.

Answer: $ 325,000 00 Thousand

i.    Medical care expenses that, in reasonable probability, will be incurred in the future.

Answer: $ 440,000 000 Thousand

14

245

# INSTRUCTIONS ON DELIBERATION

After you retire to the jury room, you will select your own presiding juror and conduct your deliberations upon your answers to the questions asked.

It is the duty of the presiding juror:

1. to preside during your deliberations;
2. to see that your deliberations are conducted in an orderly manner and in accordance with the instructions in this charge;
3. to write out and hand to the bailiff any communications concerning the case that you want to have delivered to me at any time, who will bring your written message to me. I will then respond as promptly as possible either in writing or by meeting with you in the courtroom;
4. to conduct a vote on the questions;
5. to write your answers to the questions in the spaces provided; and,
6. to certify your unanimous verdict in the space provided for the presiding juror's signature or to obtain the signatures of all jurors who agree with the verdict if your verdict is less than unanimous.

You should not discuss the case with anyone, not even with other members of the jury, unless all of you are present and assembled in the jury room. Should anyone attempt to talk to you about the case before the verdict is returned, whether at the courthouse, at your home, or elsewhere, please inform me of this fact. You must never disclose to anyone, not even to me, your numerical division on any question. Unless I direct you otherwise, do not reveal your answers until such time as you are discharged.

When you have answered all the questions you are required to answer under my instructions and your presiding juror has placed your answers in the spaces provided and signed the verdict as presiding juror or obtained the signatures, you will inform the bailiff at the door of the jury room that you have reached a verdict, and then you will return into court with your verdict.

You may now retire to the jury room to conduct your deliberations.

ALEXANDRA SMOOTS-HOGAN
DISTRICT JUDGE

15

## CERTIFICATE

We, the jury, have answered the above and foregoing questions as indicated herein, and herewith return same into Court as our verdict.

(To be signed by the presiding juror, ONLY, if unanimous.)

PRESIDING JUROR _____

(To be signed by those rendering the verdict if not unanimous.)

| | |
|---|---|
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |

16

247

# Tab C
**Trial Court Judgment**
**(CR 258-61)**

**F I L E D**
Chris Daniel
District Clerk

OCT 1 1 2013

Time _____
Harris County, Texas
By _____
Deputy

Cause No. 2011-31922

| | | |
|---|---|---|
| WILLIE DAVID WILLIAMS | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | HARRIS COUNTY, TEXAS |
| | § | |
| | § | |
| DIAMOND OFFSHORE SERVICES LIMITED | § | |
| and | § | |
| DIAMOND OFFSHORE SERVICES | § | 164th JUDICIAL DISTRICT |
| COMPANY | § | |
| Defendants. | § | |

## FINAL JUDGMENT

On September 16, 2013, this case came on to trial. Plaintiff Willie David Williams appeared in person and by and through his attorneys of record and announced ready for trial. Defendants Diamond Offshore Services Limited and Diamond Offshore Services Company appeared through their corporate representative and by and through their attorneys of record and announced ready for trial. A jury of twelve qualified jurors was thereafter duly selected and empaneled and sworn to try the case.

The Plaintiff rested on September 18, 2013, and the Defendants rested on September 19, 2013. The cause was submitted to the jury by written Charge on September 20, 2013. On September 20, 2013, the Jury returned in open Court with its verdict. The Court accepted its verdict, ordered it filed and entered of record, and discharged the Jury. The Charge of the Court, including the jury questions and the verdict of the jury, are incorporated in this Judgment by reference for all purposes.

258

Based on the jury's verdict, the Court finds that Plaintiff Willie David Williams is the successful and prevailing party, and that judgment should be rendered on the verdict in favor of Plaintiff Willie David Williams and against Defendants Diamond Offshore Services Limited and Diamond Offshore Services Company, jointly and severally. Accordingly, it is;

ORDERED, ADJUDGED, AND DECREED that Plaintiff Willie David Williams recover from Defendants Diamond Offshore Services Limited and Diamond Offshore Services Company, jointly and severally, the total sum of $8,512,068 as actual damages (which represents the total recovery less the ten percent (10%) of fault attributed to Willie David Williams by the jury, then less an offset of $197,293 reduction for the net advances paid by Defendants); and

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Plaintiff Willie David Williams recover from Defendant Diamond Offshore Services Company, owner of the vessel OCEAN LEXINGTON, prejudgment interest totaling $235,381 covering the period from January 7, 2008, through October 11, 2013, (which represents $1,557,793 in past damages less an offset of $197,293 for the net advances previously paid by Defendant, leaving past losses after reduction for advances of $1,360,500, then reduced to the 60% of fault determined by the jury to be due to the unseaworthiness of Diamond Offshore Services Company's vessel, thereby totaling $816,300, then calculated at five percent (5.0%) simple interest). The amount of the actual damages as awarded by the jury, together with the prejudgment interest as calculated above through October 11, 2013, is $8,747,449. In the event that the Judgment is not signed on October 11, 2013,

2

259

there shall be additional prejudgment interest awarded at the rate of $111.82 per day beyond that date ending on the day the Judgment is actually signed.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Plaintiff Willie David Williams additionally recover, jointly and severally, from Defendants Diamond Offshore Services Limited and Diamond Offshore Services Company post-judgment interest compounded annually at the rate of five percent (5.0%) on the actual damages, after offset and including prejudgment interest, of $8,747,449 from the date of this Judgment until paid, together with taxable costs of Court;

This judgment is final. It disposes of all claims and all parties, and is appealable.

All writs and processes for the enforcement and collection of this judgment or the costs of court may issue as necessary.

All other relief not expressly granted in this judgment is DENIED.

SIGNED THIS __1st__ DAY OF __October__ ,2013.

ALEXANDRA SMOOTS-HOGAN
DISTRICT JUDGE

Approved as to Form Only

T. Patrick Baynham
Steven K. Best
Two Lakeway Center, Suite 950
3850 N. Causeway Boulevard
Metairie, LA 70002
COUNSEL FOR DEFENDANTS

3

MICHAEL PATRICK DOYLE
State Bar No. 06095650
One Houston Center
1221 McKinney, Suite 4100
Houston, Texas 77010
COUNSEL FOR PLAINTIFF

4

# Tab D
## Court of Appeals Majority Opinion

Opinion issued July 21, 2015.



In The

# Court of Appeals

For The

## First District of Texas

————————————

## NO. 01-13-01068-CV

————————————

## DIAMOND OFFSHORE SERVICES LIMITED AND DIAMOND OFFSHORE SERVICES COMPANY, Appellants

## V.

## WILLIE DAVID WILLIAMS, Appellee

———————————————————————————————————

On Appeal from the 164th District Court
Harris County, Texas
Trial Court Case No. 2011-31922

———————————————————————————————————

## O P I N I O N

In this Jones Act case, Willie David Williams sued Diamond Offshore Services Limited and Diamond Offshore Services Company (collectively, "Diamond Offshore") for negligence and unseaworthiness arising out of an

incident in which Williams allegedly injured his back while trying to repair a piece of machinery on board an offshore oil rig owned and operated by Diamond Offshore. The trial court rendered judgment on the verdict in favor of Williams, awarding Williams, once all applicable credits and offsets had been applied, approximately $8.5 million in compensatory damages, $235,381 in pre-judgment interest, and post-judgment interest. In three issues, Diamond Offshore contends that (1) the trial court erroneously excluded a post-incident surveillance video depicting Williams performing various outdoor activities; (2) the trial court erroneously excluded evidence that Diamond Offshore paid Williams 85% of his pre-incident salary for three years before trial; and (3) the jury's damages awards for past and future disfigurement, future medical expenses, loss of future earning capacity, future pain and mental anguish, and future physical impairment were excessive.

We affirm.

## Background

Diamond Offshore owned and operated the Ocean Lexington, a drilling rig located off the coast of Egypt in 2007–08. Williams, who had worked for Diamond Offshore on two different occasions and in various capacities for approximately a decade, was a mechanic on the rig. He worked on the rig in

2

alternating "hitches": twenty-eight days on the rig, followed by twenty-eight days off.

On the afternoon of January 7, 2008, the day before Williams was scheduled to return to the United States, one of the drillers informed him that a set of elevators on the rig had failed and that he needed to repair it.[1] Specifically, the driller told Williams that the rig was "going down" unless Williams repaired the elevators. Williams testified that, to him, this directive meant, "By any means necessary, fix it."

Williams worked on the elevators for about thirty to forty minutes. Williams bent over at the waist to maneuver the elevators, which weighed several hundred pounds, into his work area. Williams did not lift the elevators; instead, he "scoot[ed]" them around on the floor of the shop. While he worked on the elevators, Williams felt a "sharp pain in [his] lower back after a few minutes." After he finished working, Williams saw the doctor onboard the rig, who advised him to rest. The next morning, Williams bent over while sitting on his bed and felt discomfort in his back.

Because his back continued to hurt after he arrived home, Williams saw Dr. Patrick Barrett, an orthopedic surgeon, ten days after the incident. Although he is an independent physician and not a company doctor, Dr. Barrett has "seen patients

_____

[1] An "elevator" is a piece of machinery that lowers pipes into the drilling hole on a rig.

3

off and on over the years for" Diamond Offshore, and Diamond Offshore referred Williams to Dr. Barrett after his injury in this case. Williams reported that he had leg pain in addition to back pain. Williams also told Dr. Barrett that he had injured his back on a rig in 2006, approximately two years before the incident at issue here. Williams acknowledged at trial that he had had ongoing back pain since the first incident, but that pain had "never stopped [him] from doing [his] job."[2]

Upon seeing Williams, Dr. Barrett ordered an MRI of Williams's lumbar spine. The MRI revealed a "small central herniation" at the L4-L5 vertebrae, "degenerative changes at multiple levels," and a "very small central bulge" at the L5-S1 vertebrae. Dr. Barrett saw Williams again in March 2008 after approximately six weeks of physical therapy. Williams had "rather significant pain in the mid to lower lumbar area," and another MRI revealed a herniation at L1-L2, a central disc protrusion at L4-L5, and another disc protrusion at L5-S1. In April 2008, Dr. Barrett performed a micro discectomy at L5-S1 to relieve Williams's lingering leg pain. Dr. Barrett testified that this surgery alleviated Williams's leg pain, but Williams's back pain remained unchanged and "continue[d] to be a major problem." Dr. Barrett's notes reflected that Williams was "simply unable to bend

---

[2] The trial court also admitted MRI records dated December 5, 2005, before either of Williams's two onboard back injuries had occurred, which revealed "[d]egenerative dis[c] disease of the lumbar spine."

4

or stoop or lift more than about 20 pounds without his back bothering him quite a bit."

In an attempt to relieve Williams's back pain, Dr. Barrett performed a fusion surgery in February 2009. This surgery involved inserting screws and rods into Williams's back. Dr. Barrett, who testified via video deposition taken in April 2012, nearly a year and a half before trial, stated that he had seen Williams one month prior to his deposition and that Williams still had problems with the nerve located next to the L5 vertebrae, which caused Williams's foot to drop and resulted in Williams's inability to raise his toes. Dr. Barrett testified that, in his opinion, further surgery would probably not help relieve Williams's lingering back pain. Dr. Barrett acknowledged Williams's pre-existing degenerative changes in his back but testified that the incident at issue caused all of Williams's current medical problems. Dr. Barrett stated that he would not release Williams to return to his former career on an offshore rig, and he opined that Williams "would have a hard time maintaining any kind of gainful employment due to his chronic pain, his chronic neurological findings; and I would professionally consider him totally disabled at this point." He further opined that, as a result of his chronic pain, Williams would likely "have a hard time even sustaining sedentary type work where he had to sit."

5

Dr. Jose Rodriguez, another orthopedic surgeon, testified that he reviewed Williams's medical records but did not treat Williams. Dr. Rodriguez stated that, in his opinion, "[t]he repetitive work that [Williams] was doing with some type of lifting associated with it caused his ruptured disc." Dr. Rodriguez testified that, after the fusion surgery, even if Williams was pain free, he would still restrict Williams to lifting not more than thirty pounds regularly and fifty pounds infrequently to avoid damaging the fusion. Dr. Rodriguez would also place restrictions on standing, sitting, and walking for long periods of time, as all of these actions place stress on the lumbar spine. Dr. Rodriguez agreed with Dr. Barrett that Williams could not return to his pre-incident offshore work. He stated that Williams could "do light-duty work if the tolerance to his [pain] allows him to function through a whole day of work."

Dr. Rodriguez testified that Williams could potentially undergo another surgery in the future to remove the screws and rods currently implanted in his back, which would hopefully improve his pain by at least fifty percent. He estimated that this procedure could cost up to $100,000. Dr. Rodriguez also testified that, even if Williams undergoes this "hardware removal" surgery, he would still have the same functional restrictions as before. He stated that Williams will need pain medications and some kind of physical exercise regimen daily for

6

the remainder of his life, which could range in cost from $5,000 to $10,000 per year.

Dr. Kenneth McCoin testified as Williams's economics expert. He testified that he calculated Williams's past lost earning capacity, measured from the date of the incident to the trial date, at $557,793 and his future lost earning capacity at $2,254,275. Dr. McCoin based his calculations on Williams's pre-incident annual salary of $134,000, the growth rate in wages, the fringe benefits, such as health insurance, the fact that Williams had received as a result of being employed, and Williams's work-life expectancy. Dr. McCoin stated on cross-examination that the "implicit assumption" in his calculations was that Williams would never return to any kind of work. He acknowledged that if Williams did return to work, his calculations would need to be reduced by the amount of Williams's new salary.

Williams no longer had tingling and numbness in his right leg after the first surgery in April 2008, but he testified that his back pain had never gone away. He stated that he had also developed a "foot drop problem," where one of his feet drags and he can no longer walk straight even on carpeted floors. Williams testified that, since the incident, he had tried to "live [his] life and do things," but that he had not "held a job where [he] receive[s] a check from anyone."

In July 2011, Williams underwent a "Functional Capacity Evaluation" that concluded that Williams could perform "medium level work." Diamond

Offshore's counsel asked Williams about this evaluation and about Dr. Rodriguez's testimony that Williams could "lift 30 pounds on a frequent basis and 50 pounds on an occasional basis" and whether Williams had attempted to find a job within those particular restrictions. Williams responded that he had not and further testified:

> [I've] been going through back surgery, two back surgeries. I get injections all the time. My back hurts constantly. I just saw the doctor three weeks ago. He wants to do exploratory surgery on my back. It's not just my back. Over the last year the—they have the documentation to show you this—the nerves between my back and my foot are not communicating anymore; and I can't move my toes, just my big toe. My toes are curling up under me. It's letting my foot drop down, and it's progressively getting worse and worse. So, I've just been talking to the doctors. They—I'm really not wanting to have any more surgery. They can't really promise me it's going to do me any good, but that's where we're at at this time.

Williams also testified that he can bend over, sit for a long period of time, stand for a long period of time, and work on cars, but that it hurts him to do all of these things.

Williams further stated that he tries to work on his property with an excavator that he owns. He testified that, for the most part, working with the excavator is stable and that he uses it for about thirty minutes at a time. He stated:

> I never said I couldn't work at all. That was the doctors or those other people. I've never stated I couldn't work at all. Anytime I said anything about that, I just said it hurts. I still do these things, all of these things. It just hurts me.

8

Williams testified that this type of work is not strenuous and that there is minimal vibration with the excavator, although his back will start to hurt if he sits in the excavator's seat for long periods of time.

Diamond Offshore's counsel asked Williams what kind of work he thought he could do after the incident. Williams responded:

> I don't know. If you're talking about me getting a job, I don't know how I would get a job. I take pain medication and muscle relaxers, and nobody's going to give you a job with that. I have bolts and rods in my back, and it hurts me. I don't know why anybody would hire me.

Williams testified that he "feel[s] terrible" and that he cannot enjoy life the way he used to because he cannot do things like ride motorcycles and race cars and boats and jet skis the way he did before the incident.

Several of Williams's friends and family members testified concerning the impact that the incident had had on Williams. Williams presented testimony from multiple witnesses that he had formerly been very active outdoors and with his fourteen-year-old daughter, who often wants to do things that Williams can no longer do, such as waterskiing and attending softball games. These witnesses testified that there is "a lot of stress" on Williams's family after the incident. The witnesses agreed that Williams tries to engage in the same activities that he used to enjoy, but that he cannot participate for very long, and that he often looks "defeated."

Williams's wife testified that since the incident Williams had been angry and depressed "a lot" and "[r]eal agitated," that they argue, and that Williams "feels like he's not worth what he used to be worth" because he can no longer provide for the family or do the things he used to enjoy doing. She also testified that Williams "still is miserable" and that Williams's injuries have affected his sleep schedule. Now, Williams hardly ever sleeps at night and instead sleeps "all day."

Thomas Meunier, a vocational rehabilitation counselor, testified that he met with Williams, performed several tests and evaluations of Williams, and reviewed Williams's medical records, including the July 2011 functional capacity evaluation, in arriving at a conclusion concerning whether Williams would be able to return to work. Meunier testified that Williams's past work history involved semi-skilled to skilled mechanic work, but that Williams did not have any transferrable skills given the postural and other work restrictions now in place on him after the incident. Meunier stated:

> I don't think [Williams] has a residual capacity to maintain employment even at a lower-exertional level because of chronic pain of the medicals that I read from his treating physician. He, I believe, is motivated. I think he would be working if he could, but I don't think he's going to be able to successfully compete for employment. And I think the bigger problem he would have, even if he were able to secure some type of employment, would be able to maintain the employment, show up every day. So, I—I think that he has lost access to the competitive labor market, and he has a corresponding loss of earning capacity.

Meunier disagreed with the conclusion reached in the functional capacity evaluation that Williams could do "medium level" work, pointing out that Williams's ability to "stand and walk, bend, [and] stoop, are limited to an occasional basis." Meunier also did not agree that Williams could return to performing any skilled work, such as heavy equipment operation or mechanics, on a stable and consistent basis. Furthermore, Meunier discounted the functional capacity evaluation on the basis that it was two years old at the time of trial and medical testimony indicated that Williams's condition had worsened since that evaluation had been performed.

Bruce Brawner testified as Diamond Offshore's vocational rehabilitation counselor. Brawner relied upon the functional capacity evaluation and opined that Williams could likely seek employment as a dispatcher, a job involving light mechanic work, or perhaps car sales or customer service. He researched the median pay in Mississippi, where Williams lives, for these professions and concluded that, if Williams found one of these jobs, Williams could potentially make around $38,600 per year. Brawner testified that each of these jobs is consistent with the physical restrictions that Dr. Rodriguez testified needed to be applied to any of Williams's future jobs.

Dr. Kenneth Boudreaux, an economist, testified for Diamond Offshore concerning potential economic loss sustained by Williams. Dr. Boudreaux testified

11

that he calculated Williams's past lost earning capacity as $504,045. With respect to loss of future earning capacity, Dr. Boudreaux stated that Diamond Offshore's counsel asked him to assume that Williams could earn roughly $38,600 per year in the future. He calculated Williams's lost future earning capacity at $760,435.[3] Dr. Boudreaux clarified that the figure for past plus future lost earning capacity equaled $1.264 million.

Dr. Christopher Cenac, an orthopedic surgeon in Louisiana, testified as Diamond Offshore's medical expert. Dr. Cenac reviewed Williams's medical records and evaluated him in person in February 2012. Dr. Cenac agreed that further relief from Williams's symptoms was not likely, even if he did undergo a hardware-removal surgery in the future, and that Williams had reached maximum medical improvement. Dr. Cenac noted that Williams has "post-surgical scarring . . . in the midline [of Williams's back] near the incision." Dr. Cenac also testified, however, that based on the July 2011 functional capacity evaluation and Williams's responses on the Oswestry pain questionnaire, which were consistent with "patients that are either bed bound or exaggerating their symptoms," Williams was employable in the future. He ultimately concluded that "hardware removal" would be appropriate and that Williams "was employable with a medium level of

---

[3] Dr. Boudreaux stated that the $760,000 figure represents the midpoint of a "reasonable" range of lost future earning capacity figures, with $668,000 at the lower end and $853,000 at the upper end.

12

physical activity based upon the findings noted on the [functional capacity evaluation], subsequent to extensive vocational rehabilitative efforts."

At a pre-trial hearing and in written objections, Williams objected to the admissibility of two pieces of evidence offered by Diamond Offshore. Williams first objected to evidence that Diamond Offshore had, "during the first couple of years of [Williams's] disability," paid Williams approximately eighty-five percent of his former salary, totaling over $260,000. Williams argued that these payments were part of a Diamond Offshore procedure "whereby the employee is paid a portion of his salary as an 'advance' against any future settlement agreement . . . and then given the remaining 15% to 'make him whole' when he recovers from his disability and returns to work." Williams argued that evidence of these payments was inadmissible pursuant to Texas Rule of Evidence 408. Williams stated that he would be willing to stipulate that Diamond Offshore was entitled to a "post-verdict credit or offset of these payments."

Diamond Offshore argued that the payments did not constitute a settlement, that it did not make the payments in attempt to persuade Williams to release any claims against it, and that these payments were part of its standard procedure whenever an employee suffered an injury. Diamond Offshore's counsel stated that the company would "advance wages on [the employee's] salary to the point that they receive 85 percent of whatever they were making before they got hurt."

13

Diamond Offshore argued that these payments were not classified as a settlement, but rather as earnings upon which Williams paid taxes.

The trial court ruled that the evidence was inadmissible. The court agreed to give Diamond Offshore a corresponding offset in the judgment, if the jury found in favor of Williams, but it refused to let Diamond Offshore present evidence that it had made these payments to Williams.

Williams also sought to exclude a post-incident surveillance video of him taken in 2012, nearly five years after his injury occurred, by an investigator hired by Diamond Offshore. Williams stated:

> Along with showing him driving and walking in several locations, these surveillance videos contain views of the plaintiff engaged in various activities near and around his residence, including performing various repairs on his four-wheeler vehicle, operating his mini-excavator to clear some debris near his home, and certain activities involving some bending and lifting, activities which he has never denied, under oath or otherwise, that he has attempted and was able to perform (nor are inconsistent with his medical limitations).

He argued that the video has no impeachment value because he has never asserted that he cannot do any of the activities depicted in the video. Williams further argued that the prejudicial effect of the video far outweighed any probative value that it might have and that the video could not serve as substantive evidence "since such a minimal and random view of plaintiff's life cannot possibly be a fair representation of his disabilities or abilities since his injury."

Diamond Offshore argued that the video consisted of surveillance footage taken on three consecutive days in December 2012 and depicted Williams "with evident ease to be seen bending, stooping, reaching, and throwing as he manually picks up debris on his property and puts it in the back of a trailer. He gets back in his trailer, hauls it off. He's apparently disposing of stuff." In the video, Williams operates machinery "for an extended period of time" and repairs vehicles. Diamond Offshore argued that the video was admissible for both impeachment purposes and as substantive evidence relating to Williams's post-incident physical condition.

The trial court ruled that Diamond Offshore "can keep [the video] in your reserve bank for impeachment, and that's it. So, if [Williams] opens the door, then we'll take a look at it." Diamond Offshore requested that the trial court revisit this ruling on several occasions throughout the proceedings, including during Dr. Rodriguez's testimony and after cross-examination of Williams, both of which, Diamond Offshore's counsel argued, contradicted the contents of the video. The trial court refused to admit the surveillance video.

The jury found that both Diamond Offshore and Williams were negligent and that Diamond Offshore failed to furnish a seaworthy vessel. The jury apportioned 30% fault to Diamond Offshore, 60% fault to the vessel Ocean Lexington, and 10% fault to Williams. The jury awarded Williams $500,000 in

past physical pain and mental anguish, $3.4 million in future physical pain and mental anguish, $557,793 in loss of past earning capacity, $2,254,275 in loss of future earning capacity, $250,000 in past physical impairment, $1.7 million in future physical impairment, $250,000 in past disfigurement, $325,000 in future disfigurement, and $440,000 in future medical care expenses.

The trial court entered judgment on the verdict in favor of Williams. The final judgment stated:

> Plaintiff Willie David Williams recover from Defendants Diamond Offshore Services Limited and Diamond Offshore Services Company, jointly and severally, the total sum of $8,512,068 as actual damages (which represents the total recovery less the ten percent (10%) of fault attributed to Willie David Williams by the jury, then less an offset of $197,293 reduction for the net advances paid by Defendants) . . . .

The trial court also awarded Williams pre- and post-judgment interest. This appeal followed.

## Exclusion of Evidence

In its first issue, Diamond Offshore contends that the trial court erroneously excluded a post-incident surveillance video taken by an investigator hired by Diamond Offshore that depicted Williams performing various outdoor activities over the course of three days in December 2012. In its second issue, Diamond Offshore contends that the trial court erroneously excluded evidence that, for several years before trial, it paid Williams 85% of his pre-incident salary.

16

## A. Standard of Review

The admission or exclusion of evidence "is committed to the trial court's sound discretion." *Tex. Dep't of Transp. v. Able*, 35 S.W.3d 608, 617 (Tex. 2000). A trial court abuses its discretion when it acts without reference to any guiding rules or principles. *U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 132 (Tex. 2012); *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 754 (Tex. 1995). A trial court does not abuse its discretion simply because the appellate court would have ruled differently under the same circumstances. *See E.I. DuPont de Nemours & Co., Inc. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995). We uphold a trial court's evidentiary ruling "if there is any ground for doing so, even if the trial court did not rely upon the proper ground and even if the defendant did not assert a proper ground for excluding the evidence." *K.J. v. USA Water Polo, Inc.*, 383 S.W.3d 593, 610 (Tex. App.—Houston [14th Dist.] 2012, pet. denied); *see also State Bar of Tex. v. Evans*, 774 S.W.2d 656, 658 n.5 ("[E]ven where the trial court errs in sustaining a specific untenable objection, an appellate court should uphold the ruling if there is any other ground for doing so, even though not urged below.").

For the exclusion of evidence to constitute reversible error, the complaining party must demonstrate (1) that the trial court committed error, and (2) that the error was reasonably calculated to, and probably did, cause rendition of an improper judgment. *Hahn v. Love*, 394 S.W.3d 14, 34 (Tex. App.—Houston [1st

Dist] 2012, pet. denied). "[A] successful challenge to evidentiary rulings usually requires the complaining party to show that the judgment turns on the particular evidence excluded or admitted." *Able*, 35 S.W.3d at 617. We generally do not reverse a judgment based on an erroneous ruling on evidence admissibility when the evidence in question is cumulative and is not controlling on a material issue dispositive to the case. *Id.* In determining if the excluded evidence probably resulted in the rendition of an improper judgment, we review the entire record. *Id.*; *Hahn*, 394 S.W.3d at 35.

### B.   *Exclusion of Surveillance Video*

Diamond Offshore first challenges the trial court's decision to exclude its proffered post-incident surveillance video, an eighty-minute video that depicted Williams performing various outdoor tasks, such as using his excavator to haul debris and working on a vehicle, over the course of three days in December 2012. It argues that the trial court erroneously determined that the surveillance video could be used solely for impeachment purposes and that, instead, the video was admissible as both substantive evidence relevant to the extent of Williams's injuries and as impeachment evidence. Williams, however, contends that the prejudicial effect of the "heavily edited" video substantially outweighs any probative value, and it is, therefore, inadmissible under Rule 403. He also argues that Diamond Offshore did not establish the authenticity of the video, as required

18

by Texas Rule of Evidence 901(a). *See* TEX. R. EVID. 901(a) ("The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."). Finally, he argues that this evidence was cumulative. *See* TEX. R. EVID. 403.

Texas courts have admitted post-accident surveillance videos depicting the activities of injured plaintiffs in personal injury cases, but no Texas case addresses, as a specific point on appeal, the admissibility and propriety of this evidence. *See Huston v. United Parcel Serv., Inc.*, 434 S.W.3d 630, 642 (Tex. App.—Houston [1st Dist.] 2014, pet. denied) (considering post-accident surveillance video in factual sufficiency review of damages award; appellant plaintiff did not challenge admissibility of video on appeal); *Nat'l Freight, Inc. v. Snyder*, 191 S.W.3d 416, 424 (Tex. App.—Eastland 2006, no pet.) (upholding exclusion of six-second portion of surveillance video in which plaintiff made obscene gesture; appellant did not challenge trial court's admission of remainder of video); *Dunn v. Bank-Tec S.*, 134 S.W.3d 315, 329 & n.7 (Tex. App.—Amarillo 2003, no pet.) (addressing whether surveillance video had been properly authenticated and stating that appellants waived any argument that prejudicial effect of video substantially outweighed video's probative value); *Home Ins. Co. v. Garcia*, 74 S.W.3d 52, 56–57 (Tex. App.—El Paso 2002, no pet.) (considering surveillance video in factual

19

sufficiency review; plaintiff did not challenge admissibility of video). Both Diamond Offshore and Williams thus rely on case law from other jurisdictions to support their contentions.

In *Chiasson v. Zapata Gulf Marine Corp.*, 988 F.2d 513 (5th Cir. 1993), the Fifth Circuit considered whether a post-accident surveillance video constituted substantive evidence in addition to merely impeachment evidence in a personal-injury case. The Fifth Circuit defined "substantive evidence" as evidence that "is offered to establish the truth of a matter to be determined by the trier of fact." *Id.* at 517. The plaintiff, Chiasson, claimed that as a result of her injury she had suffered "great physical and mental pain and anguish," and she sought damages to "loss of enjoyment from the activities of her normal life." *Id.* The court therefore noted that "the severity of [Chiasson's] pain and the extent to which she has lost the enjoyment of normal activity are among the key issues a jury must decide in calculating her damages." *Id.* The court concluded that evidence that "would tend to prove or disprove such losses" should be considered "substantive" evidence. *Id.* The court also noted that Chiasson had testified at trial that she is able to engage in her usual daily activities, but that she cannot do so "for too long of a period of time" before she starts to feel pain. *Id.* The court doubted whether the surveillance video at issue "discredits her testimony at all," but still ultimately held that, not

20

only did the video constitute substantive evidence, instead of merely impeachment evidence, but that the importance of the video was "obvious."[4]

The Fifth Circuit affirmed its reasoning in *Chiasson* in *Baker v. Canadian National/Illinois Central Railroad*, 536 F.3d 357, 369 (5th Cir. 2008). After the his accident, Baker alleged that his injuries and post-accident limitations included "the inability to count money, make change, or be in crowds." *Id.* Illinois Central offered a surveillance video that depicted Baker "spending long periods of time in casinos," and Baker argued, among other things, that the video "informed jurors that he engaged in activities many people consider immoral." *Id.* The Fifth Circuit held, pursuant to *Chiasson*, that this video constituted substantive evidence. *Id.* The court also noted that the issue of Baker's "post-accident quality of life was hotly disputed" and that Baker's witnesses "testified in details regarding the allegedly severe post-accident limitations Baker face[d]." *Id.* The court ultimately concluded that the probative value of the video that contradicted Baker's witnesses "weighs heavily against a hypothetical juror's moral aversion to gambling." *Id.*

---

[4] The precise issue in *Chiasson* was whether the trial court erred in admitting the surveillance video solely as impeachment evidence when, pursuant to Federal Rule of Civil Procedure 26(b)(1), which allows the "non-disclosure of evidence to be used solely for impeachment," Zapata had not disclosed the existence of the video to Chiasson pre-trial. 988 F.2d 513, 514 (5th Cir. 1993). Because the surveillance video at issue constituted substantive evidence, instead of simply impeachment evidence, the Fifth Circuit held that the trial abused its discretion "by allowing non-disclosure and admitting the tape into evidence." *Id.* at 518.

The court held that the trial court did not abuse its discretion by admitting the surveillance video. *Id.*

In *James v. Carawan*, 995 So.2d 69 (Miss. 2008), the Mississippi Supreme Court addressed whether the trial court abused its discretion in excluding a post-accident surveillance video of the plaintiff, who had injured her back, riding rollercoasters at a Six Flags amusement park. In concluding that the trial court did abuse its discretion in excluding the video, the court noted that "[a] reasonable juror could conclude that the Six Flags video casts doubt on the severity of Carawan's injuries," that "a reasonable juror might conclude that the Six Flags video has a tendency to show that Carawan may not have been as weakened or vulnerable as she indicated to her doctors or as her medical treatments suggest," that "[t]he video also could have been relevant to whether or not she truly had been unable to work," that the video was relevant to the question of appropriate damages for pain and suffering, and that "this video might shed doubt upon the merits of Carawan's case as a whole." *Id.* at 76. The court concluded,

> We already have determined that the video was relevant. Aside from its damaging effect to Carawan's case, we are unable to determine how its admission would unfairly prejudice Carawan. A reasonable juror could understand that the video calls into question the severity of Carawan's injuries prior to July 29, 2003, and therefore challenged the necessity of at least some of her medical expenses, the validity of her lost wages, the extent of her pain and suffering, and the legitimacy of her entire claim.

*Id.* at 77–78; *see also Zegarelli v. Hughes*, 814 N.E.2d 795, 798 (N.Y. 2004) (holding that trial court committed reversible error in excluding post-accident videotape of injured plaintiff shoveling snow after plaintiff testified that he took "two or three swipes" of parking area with shovel); *Sweet v. Pace Membership Warehouse, Inc.*, 795 A.2d 524, 528 (R.I. 2002) (reversing trial court's decision to exclude post-accident surveillance video and directing trial court, on remand, to evaluate admissibility of video under Rule 403).

Williams, in contrast, cites cases from other jurisdictions holding that the trial court did not abuse its discretion in excluding post-accident surveillance videos. In one line of cases from Illinois, the appellate court, in concluding that the danger of unfair prejudice outweighed the probative value of the surveillance videos, focused on the facts that the videotapes were edited and only showed the plaintiff outside, "giv[ing] the impression that [the] plaintiff's activity is constant" and that the plaintiff "can sustain labor-intensive activities over a period of time without rest or without experiencing pain." *See Carroll v. Preston Trucking Co.*, 812 N.E.2d 431, 435–36 (Ill. Ct. App. 2004); *see also Donnellan v. First Student, Inc.*, 891 N.E.2d 463, 478 (Ill. Ct. App. 2008) (relying on *Carroll* to affirm exclusion of surveillance video and stating, "Despite defendant's contention that [the videographer] testified that the video was not edited to demonstrate only the period plaintiff was working and that he filmed every moment that he could, the

23

video leaves the impression that plaintiff was working for extended periods of time"). Williams also cites *Quinn v. Wal-Mart Stores, Inc.*, 774 So. 2d 1093, 1098 (La. Ct. App. 2000), for the proposition that the trial court properly excludes a post-accident surveillance video when the injured plaintiff testifies that she can perform the activities depicted in the video and when the video does "not fairly indicate whether [the plaintiff] did experience pain after engaging in these activities." *See also Orgeron v. Tri State Road Boring, Inc.*, 434 So. 2d 65, 68–69 (La. 1983) (noting, in holding that workers' compensation carrier had "no reasonable basis for terminating benefits" even though videotape existed of claimant performing physical labor at construction sites after injury, that "evidence in the form of moving pictures or videotapes must be approached with great caution because they show only intervals of the activities of the subject, they do not show rest periods, and do not reflect whether the subject is suffering pain during or after the activity").

Here, Diamond Offshore offered a surveillance video that depicts Williams performing various activities outside his house, including using his excavator to haul away scrap materials and repairing a vehicle. The hour-long video contains footage obtained over three consecutive days in December 2012. The video only reflects Williams's outside activities and does not reflect what he did when he was not outside or whether he was in pain as a result of his activities. During his

24

testimony, Williams acknowledged that he could perform the activities depicted in the surveillance video, although he emphasized that he could only engage in these activities for short periods of time before he felt pain and that he would be in pain later after engaging in these activities. Williams's friends and family members testified to essentially the same facts.

A trial court's evidentiary rulings are committed to the court's "sound discretion," and we must uphold the court's ruling if there is any basis for doing so. *See Able*, 35 S.W.3d at 617; *USA Water Polo*, 383 S.W.3d at 610. Here, the trial court did not state a reason for its ruling; instead, it merely stated at the pre-trial hearing that Diamond Offshore could "keep [the surveillance video] in your reserve bank for impeachment" and that, if Williams "opens the door, then we'll take a look at it." When Diamond Offshore offered the video after Dr. Rodriguez's testimony, the court stated, "Ruling stands the same," and when Diamond Offshore offered the video after cross-examination of Williams, the court stated, "No, not admitting," without providing a rationale. No Texas case squarely addresses the issue present here—the admissibility of post-accident surveillance videotapes as either substantive or impeachment evidence—and cases from other jurisdictions have emphasized the trial court's discretion in ruling on the admissibility of such evidence, upholding trial courts' rulings admitting post-accident surveillance videos and upholding rulings excluding this evidence. In the absence of authority

binding on this Court, we cannot conclude that the trial court abused its discretion in excluding the post-accident surveillance video offered by Diamond Offshore. The trial court could have reasonably determined that the proffered video, which contained clips from three different days of surveillance edited together into one continuous hour-long video and depicted Williams performing activities that he admitted that he could do, albeit with pain later, created an impression that Williams could engage in physical activity for long periods of time without needing rest and without apparent pain and thus that the prejudicial effect of the video outweighed the video's probative value. *See Donnellan*, 891 N.E.2d at 478; *Carroll*, 812 N.E.2d at 435–36; *Quinn*, 774 So. 2d at 1098; *see also USA Water Polo*, 383 S.W.3d at 610 (stating that we uphold trial court's evidentiary rulings "if there is any ground for doing so, even if the trial court did not rely upon the proper ground and even if the defendant did not assert a proper ground for excluding the evidence"). We therefore hold that the trial court did not abuse its discretion in excluding the surveillance video proffered by Diamond Offshore.

We overrule Diamond Offshore's first issue.

### C.  *Exclusion of Salary Payments*

Diamond Offshore also challenges the trial court's exclusion of evidence that, for several years pre-trial, Diamond Offshore paid Williams 85% of his pre-incident salary, totaling over $260,000. Diamond Offshore argues on appeal that

26

excluding this evidence left the erroneous impression with the jury that Williams had no income to provide for his family during the years between the incident and the trial, that Diamond Offshore "left [Williams] high and dry during his recovery," and that Diamond Offshore did not care about its employees, which caused the jury to use the compensatory damages awards to punish Diamond Offshore. The trial court excluded the evidence but noted on the record that, if the jury returned a verdict in Williams's favor, the court would offset the damages award by the amount that Diamond Offshore had previously paid to Williams. The trial court ultimately discounted the award to Williams by $197,253 as a result of "net advances" paid to Williams by Diamond Offshore.

Assuming, without deciding, that the trial court erred when it excluded evidence that Diamond Offshore had paid Williams 85% of his pre-incident salary, Diamond Offshore has not demonstrated that this exclusion constitutes reversible error. *See Able*, 35 S.W.3d at 617 (holding that successful challenge to evidentiary ruling generally requires complaining party to show judgment turned on excluded evidence); *Hahn*, 394 S.W.3d at 34 (stating that, to be reversible, error must be reasonably calculated to, and probably did, cause rendition of improper judgment). As Diamond Offshore acknowledges, the trial court offset the ultimate damage award in the final judgment to account for the amounts paid to Williams.

Diamond Offshore's arguments of harm as it relates to the exclusion of these payments are, however, entirely speculative. There is no indication in the record that the jury inflated one of the damages awards in an attempt to punish Diamond Offshore for a misperception that Diamond Offshore abandoned Williams and left him in a precarious financial situation prior to trial. Instead, the record reflects that Williams underwent two surgeries as a result of the incident, that he suffers from "constant" back pain and likely will for the rest of his life, that he suffers from progressive "foot drop," that he can no longer engage in outdoor activities and activities with his daughter due to his chronic pain, and that he will likely be unable to work even in "light" or sedentary jobs in the future due to his pain, all of which, as we explain further below, justifies the jury's damages awards. We conclude that Diamond Offshore has not demonstrated that the trial court's exclusion of evidence that Diamond Offshore paid Williams 85% of his pre-incident salary "was reasonably calculated to, and probably did, cause rendition of an improper judgment." *Hahn*, 394 S.W.3d at 34. We hold that the trial court did not commit reversible error by excluding this evidence.

We overrule Diamond Offshore's second issue.

### Sufficiency of the Evidence of Damages

In its third issue, Diamond Offshore challenges the sufficiency of the evidence to support the jury's awards for past and future disfigurement, future

28

medical care expenses, loss of future earning capacity, future physical pain and mental anguish, and future physical impairment.[5]

Texas courts of appeals have the power to review the excessiveness of damage awards and to order remittitur in Jones Act cases. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406 (Tex. 1998). We must make our own "detailed appraisal of the evidence bearing on damages." *Id.*

The standard of review for an excessive-damages complaint in a Jones Act case is factual sufficiency of the evidence. *Id.* In reviewing a challenge to the factual sufficiency of the evidence, we "must consider and weigh all of the evidence and should set aside the judgment only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Arias v. Brookstone, L.P.*, 265 S.W.3d 459, 468 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) (citing *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam)); *see also Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001) (same). The fact-finder is the sole judge of the witnesses' credibility, and it may choose to believe one witness over another, and a reviewing court may not impose its own opinion to the contrary. *City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005); *Arias*, 265 S.W.3d at 468; *see also Lanier v. E. Founds., Inc.*, 401 S.W.3d

---

[5]     We note that Diamond Offshore does not challenge on appeal the sufficiency of the evidence to support the jury's finding that Diamond Offshore was negligent and that its negligence "was a cause, in whole or in part," of Williams's injuries.

445, 455 (Tex. App.—Dallas 2013, no pet.) ("When we review the evidence, we may not reweigh it and set aside the verdict merely because we feel a different result is more reasonable."). Because it is the fact-finder's province to resolve conflicts in the evidence, we assume that it resolved all such conflicts in favor of the verdict if reasonable people could do so. *City of Keller*, 168 S.W.3d at 819; *Arias*, 265 S.W.3d at 468.

The jury generally has great discretion in considering the evidence relevant to the issue of damages. *See Lanier*, 401 S.W.3d at 455 (citing *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986)); *Tagle v. Galvan*, 155 S.W.3d 510, 518 (Tex. App.—San Antonio 2004, no pet.) ("In assessing personal injury damages, the jury has wide latitude in determining the amount of the award."). "The process of awarding damages for amorphous, discretionary injuries such as pain and suffering is inherently difficult because the alleged injury is a subjective, unliquidated, nonpecuniary loss." *Id.* The element of pain and suffering is "not subject to precise mathematical calculations or objective analysis and is particularly within the province of the jury to resolve and to determine appropriate amounts." *Id.* "Once the existence of some pain, mental anguish and disfigurement has been established, there is no objective way to measure the adequacy of the amount awarded as compensation, which is generally left to the discretion of the fact finder." *Figueroa v. Davis*, 318 S.W.3d 53, 62 (Tex. App.—

30

Houston [1st Dist.] 2010, no pet.) (quoting *Pentes Design, Inc. v. Perez*, 840 S.W.2d 75, 80 (Tex. App.—Corpus Christi 1992, writ denied)).

Issues such as physical impairment are necessarily speculative, "and it is particularly within the jury's province to resolve these matters and determine the amounts attributable thereto." *Lanier*, 401 S.W.3d at 455; *Figueroa*, 318 S.W.3d at 62 ("The amount of damages awarded for pain and suffering and disfigurement are necessarily speculative and each case must be judged on its own facts."). To recover damages for physical impairment, "the effect of any physical impairment must be substantial and extend beyond any pain, suffering, mental anguish, lost wages or diminished earning capacity." *Doctor v. Pardue*, 186 S.W.3d 4, 18 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) (quoting *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 772 (Tex. 2003)). The jury may consider "loss of enjoyment of life" as a factor in assessing damages for physical impairment. *Id.*

Courts have defined disfigurement as "that which impairs the appearance of a person, or that which renders unsightly, misshapen or imperfect, or deforms in some manner." *Figueroa*, 318 S.W.3d at 64 (quoting *Pardue*, 186 S.W.3d at 18). The fact that the disfigurement, such as a scar, is located underneath clothing and may not generally be visible, does not render disfigurement non-compensable. *See Wal-Mart Stores, Inc. v. Tinsley*, 998 S.W.2d 664, 673 (Tex. App.—Texarkana 1999, pet. denied) (holding that "small" surgical scar located on plaintiff's lower

31

back and hip that was covered by clothing was compensable). Future disfigurement is "necessarily speculative," and "there is no mathematical yardstick by which one can measure damages for it." *Figueroa*, 318 S.W.3d at 64 (quoting *Tri-State Motor Transit Co. v. Nicar*, 765 S.W.2d 486, 494 (Tex. App.—Houston [14th Dist.] 1989, no writ)). Proof of additional scarring or deforming is not required to recover damages for future disfigurement, although it may be considered as a factor in determining damages. *Hopkins Cnty. Hosp. Dist. v. Allen*, 760 S.W.2d 341, 344 (Tex. App.—Texarkana 1988, no writ). Recovery for future disfigurement includes recovery for future embarrassment caused by the disfigurement. *Id.*

The Texas Supreme Court has defined "mental anguish" as a "relatively high degree of mental pain and distress" that is "more than mere disappointment, anger, resentment or embarrassment." *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995). To survive a sufficiency challenge, the plaintiff must have introduced direct evidence of the nature, duration, and severity of his mental anguish, establishing a substantial disruption in his daily routine. *Id.*; *Finley v. P.G.*, 428 S.W.3d 229, 235 (Tex. App.—Houston [1st Dist.] 2014, no pet.) ("[A]n award of mental anguish damages may be supported by some evidence of 'a high degree of mental pain and distress' that is 'more than mere worry, anxiety, vexation, embarrassment, or anger.'"). If compensable mental anguish has been established,

32

fixing the exact amount of damages is "generally left to the discretion of the fact finder," although the amount must be "fair and reasonable compensation." *Finley*, 428 S.W.3d at 235 (quoting *Figueroa*, 318 S.W.3d at 62). The injured party can establish mental anguish through his own testimony explaining how he felt and how the injury disrupted his life. *Tagle*, 155 S.W.3d at 519.

Loss of future earning capacity is the plaintiff's diminished capacity to earn a living after trial. *Plainview Motels, Inc. v. Reynolds*, 127 S.W.3d 21, 35 (Tex. App.—Tyler 2003, pet. denied). Proof of lost earning capacity is always uncertain and is left largely to the jury's discretion. *Rigdon Marine Corp. v. Roberts*, 270 S.W.3d 220, 232 (Tex. App.—Texarkana 2008, pet. denied). To support an award of damages for loss of future earning capacity, the plaintiff must introduce evidence sufficient to allow the jury to reasonably measure earning capacity in monetary terms. *Tagle*, 155 S.W.3d at 519. The plaintiff can introduce evidence of past earnings; his stamina, efficiency, and ability to work with pain; the weaknesses and degenerative changes that will naturally result from the plaintiff's injury; and the plaintiff's work-life expectancy. *Id.* The plaintiff must introduce some evidence that he had the capacity to work prior to the injury and that his capacity was impaired as a result of the injury. *Id.*

Similarly, courts have held that the award of future medical expenses rests within the jury's sound discretion. *Rosenboom Mach. & Tool, Inc. v. Machala*,

995 S.W.2d 817, 828 (Tex. App.—Houston [1st Dist.] 1999, pet. denied). The jury can make its determination of the amount of future medical expenses based on the injuries suffered, the medical care rendered before trial, the progress toward recovery under the treatment received, and the condition of the injured party at the time of trial. *Id.* To sustain an award of future medical expenses, the plaintiff must present evidence establishing that, in all reasonable probability, future medical care will be required and the reasonable cost of that care. *Id.*; *see Nat'l Freight, Inc. v. Snyder*, 191 S.W.3d 416, 422 (Tex. App.—Eastland 2006, no pet.). The plaintiff is not required to establish such costs through expert testimony. *See Snyder*, 191 S.W.3d at 426. Because "'an award of future medical expenses . . . lies largely within the factfinder's discretion,' appellate courts are especially hesitant to disturb a fact-finder's conclusion in this regard." *Finley*, 428 S.W.3d at 234; *Antonov v. Walters*, 168 S.W.3d 901, 908 (Tex. App.—Fort Worth 2005, pet. denied) ("Because issues such as life expectancy, medical advances, and the future costs of products and services are, by their very nature, uncertain, appellate courts are particularly reluctant to disturb a jury's award of these damages.").

### A. Disfigurement

Diamond Offshore contends that legally insufficient evidence supports the jury's award of $575,000 for past and future disfigurement, or, in the alternative,

34

that the award is excessive. Diamond Offshore contends that no witness testified about any external scarring and thus no evidence supports the disfigurement award.

As Williams points out, however, Diamond Offshore's own medical expert, Dr. Cenac, testified that, as a result of his two back surgeries, Williams has some "post-surgical scarring" near the incision on his back. The fact that this scar is in a location of the body that is usually covered up by clothing does not preclude a disfigurement award. *See Tinsley*, 998 S.W.2d at 673 (holding that evidence of "small" surgical scar located on plaintiff's back and hip constituted compensable disfigurement award).

Furthermore, "disfigurement" is not limited to scarring, but instead constitutes anything that "impairs the appearance of a person, or that which renders unsightly, misshapen or imperfect, or deforms in some manner." *Figueroa*, 318 S.W.3d at 64 (quoting *Pardue*, 186 S.W.3d at 18). Multiple witnesses, including Williams himself, testified that he now suffers from "foot drop" due to nerve damage from the injury, which has impaired his ability to extend several of his toes and raise his right foot when he walks. As a result, his foot "drags" when he walks, and he walks with a noticeable limp. Dr. Barrett testified that Williams's "foot drop" problem is "progressive." We conclude that this testimony supports the jury's decision to award damages for past and future disfigurement. *See USX Corp. v. Salinas*, 818 S.W.2d 473, 489 (Tex. App.—San Antonio 1991, writ denied)

35

(holding that sufficient evidence supports disfigurement award when plaintiff presented evidence that he "cannot stand straight" and, due to injury, walks "with a flat-foot stiff gait").

Diamond Offshore also cites three cases for the proposition that the disfigurement award in this case was "too high by an order of magnitude," but, in each of the three cases Diamond Offshore cited, the appellate court simply affirmed the damages award. *See Allen*, 760 S.W.2d at 344 (affirming $50,000 future-disfigurement award); *Nw. Mall, Inc. v. Lubri-Ion Int'l, Inc.*, 681 S.W.2d 797, 804 (Tex. App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.) (affirming $25,000 past-disfigurement award and $30,000 future-disfigurement award); *Pedernales Elec. Co-op., Inc. v. Schulz*, 583 S.W.2d 882, 886 (Tex. Civ. App.— Waco 1979, writ ref'd n.r.e.) (affirming $4,000 disfigurement award). The fact that the appellate courts in each of these cases did not find a smaller disfigurement awards to be excessive does not support the conclusion that the disfigurement awards in this case—$250,000 in past disfigurement and $325,000 in future disfigurement—are excessive. Awarding damages for future disfigurement is "necessarily speculative," and "there is no mathematical yardstick by which one can measure damages for it." *Figueroa*, 318 S.W.3d at 64. Due to the speculative nature of a disfigurement damages award, courts generally leave the adequacy of the amount of the award to the discretion of the jury. *See id.* at 62. We conclude

36

that the evidence supporting past and future disfigurement is not so weak as to render the disfigurement awards excessive or manifestly unjust.

## B. *Future Medical Expenses*

Diamond Offshore next contends that the jury's award of $440,000 for future medical expenses is excessive because evidence of future medical expenses that Williams "could or might incur is no evidence of recoverable expenses that he 'will require in the future.'"

Dr. Barrett, Williams's treating physician, testified that he does not have any future surgeries scheduled for Williams, and Williams testified that he is "really not wanting to have any more surgery" because none of his doctors can promise him that another surgery will help him. However, Dr. Rodriguez testified that Williams was a candidate for further surgery to remove the screws and rods in his back, and Dr. Cenac, Diamond Offshore's medical expert, testified that this hardware-removal surgery "would be appropriate." Dr. Rodriguez testified that medical bills for this surgery could range from $80,000 to $100,000. Williams testified that he saw his doctor three weeks before trial and that his doctor wanted to perform exploratory surgery on his back, although he had not committed to having any additional surgeries. Dr. Rodriguez also testified that Williams will need daily pain medication and physical therapy for the rest of his life, and he estimated that costs for this care would range from $5,000 to $10,000 per year.

37

The jury thus had evidence before it that, even though Williams's preference at the time of trial was not to have another surgery, a hardware-removal surgery was medically indicated and "would be appropriate." Williams was not required to establish his future medical expenses with absolute certainty; instead, he needed to present evidence "that in all reasonable probability, future medical care will be required and the reasonable cost of that care." *See Machala*, 995 S.W.2d at 828. The jury, in its sound discretion to award damages for future medical expenses, could have reasonably concluded that, given the degenerative nature of Williams's conditions, Williams, "in all reasonable probability" will require pain medication and physical therapy for the remainder of his life and may elect to undergo further surgery to alleviate his pain. *See id.* (holding that award of future medical expenses "rests within the sound discretion of the jury"). We hold that the jury's award of $440,000 in future medical expenses was not excessive.

### C. Lost Future Earning Capacity

Diamond Offshore next contends that the jury's award of $2,254,275 for lost future earning capacity is excessive because it rests on the assumption that Williams will never be able to work again, and factually insufficient evidence supports that assumption.

Dr. Kenneth McCoin, Williams's economic expert, testified that he arrived at his calculation of $2,254,475 for Williams's loss of future earning capacity

based on the assumption that Williams will not return to work in the future. Dr. Barrett testified unequivocally that Williams could not return to his pre-incident offshore work, a conclusion with which all of the other experts agreed. Dr. Barrett further testified that, as a result of his chronic pain, Williams likely would not be able to maintain any type of gainful employment, even sedentary-type work, and he also stated that he considered Williams to be "totally disabled." Dr. Rodriguez testified that Williams might be able to perform "light duty" work, but he also provided the caveat that this was true only if "the tolerance to [Williams's pain] allows him to function through a whole day of work." Thomas Meunier, a vocational rehabilitation counselor, testified that even if Williams could secure employment, he likely would not be able to maintain it given his chronic pain. In reaching his conclusion, Meunier considered the functional capacity evaluation that Williams had undergone, which indicated that Williams could perform "medium" level work, but he ultimately discounted it because it was two years old and evidence indicated that Williams's condition had worsened since that evaluation. Williams himself testified that he tries to do work around his property, including using his excavator and repairing vehicle, and he can engage in these activities to an extent, but it hurts him to do so, and he doubted his ability to perform a full day of work every day. He did not believe that any employer would

hire him given his pain levels and the pain medication and muscle relaxers that he must take.

To support its contention that factually insufficient evidence supported the assumption that Williams could not return to work, Diamond Offshore focuses on the functional capacity evaluation, Williams's testimony that he could still work but that it hurt him to do so, and Williams's testimony concerning activities that he undertakes even after the incident. As stated, however, Williams presented the testimony of three expert witnesses—two doctors and a vocational rehabilitation counselor—that Williams would probably not be able to sustain employment at even a light or sedentary level due to his chronic pain problems. We conclude that factually sufficient evidence supports the assumption that Williams will not be able to return to the workforce and thus supports Dr. McCoin's calculation of $2,254,475 in loss of future earning capacity damages. *See Rigdon Marine Corp.*, 270 S.W.3d at 232 (holding that loss of future earning capacity is "always uncertain" and is "left largely to the jury's discretion").

### D. Future Pain and Mental Anguish

Diamond Offshore also challenges the jury's award of $3.4 million in damages for future pain and mental anguish, focusing primarily on the fact that the jury was instructed that it could only award damages for the "portion of the plaintiff's condition resulted from the aggravation" of a pre-existing condition, and

the medical evidence indicated that Williams, at the time of the incident, already had a "diseased" back.

Diamond Offshore is correct that the record includes evidence that Williams had injured his back prior to the incident at issue in this case and that the MRI Williams underwent when he first saw Dr. Barrett after the incident in January 2008 revealed degenerative problems with the discs in his back. However, Dr. Barrett testified that the January 2008 incident on the Ocean Lexington caused all of Williams's current medical problems, including his foot drop and ongoing back pain, and necessitated both of the surgeries that Williams has needed since the incident. Specifically, Dr. Barrett testified:

> I think all of [Williams' current medical conditions] are caused by the injury that [Williams] described to me occurring 10 days or so before I first saw him. He certainly undeniably had preexisting degenerative changes but, also, in my opinion, undeniably there was a significant damage that led to the evaluations which led to the micro discectomy which led to basically a disruption of his back mechanics which led to our decision to try to improve those with the fusion. And all of this, in my opinion, relates back to this [in]jury.

Williams testified that he gets pain injections "all the time," that his back "hurts constantly," and that his foot drop is "progressively getting worse and worse." Both Dr. Barrett and Meunier characterized Williams's pain as "chronic." Several of Williams's friends and family members testified about seeing Williams in pain after the incident. Multiple witnesses, including Williams's wife, testified that he is "depressed" and "miserable" since the incident, that he has experienced a loss of

self-worth, and that Williams hardly ever sleeps through the night and instead sleeps "all day."

As it did in attacking the disfigurement award, Diamond Offshore compares the future pain and mental anguish award in this case to the award in other personal injury cases and argues that "[i]n light of other verdicts," the award in this case is "plainly excessive." Diamond Offshore contends that when an award of future pain and mental anguish exceeds $1 million, "the injury is usually catastrophic." Once again, however, in all of these cases, the appellate courts found the damage awards to be within the jury's wide discretion in awarding damages and affirmed the awards. Diamond Offshore cites no cases in which an appellate court found the future pain and mental anguish award to be excessive. Simply because an appellate court affirmed a $1 million future pain and mental anguish award as not excessive in a "catastrophic" injury case does not mean that the jury's award in this case is excessive or falls outside the jury's wide discretion in awarding damages. *See, e.g.*, *Rentech Steel, L.L.C. v. Teel*, 299 S.W.3d 155, 165–67 (Tex. App.— Eastland 2009, pet. dism'd) (affirming, among other awards, award of $1 million for future pain and suffering and award of $300,000 for future mental anguish in case in which sixteen-year-old boy's hands were "degloved" following accident with steel roller machine).

Here, Williams presented evidence that he is in constant pain, that his condition, particularly his "foot drop," is getting worse, that he is likely to be in pain for the rest of his life, that he suffers from depression and a loss of self worth following the incident, and that he can no longer engage in the activities he used to enjoy to the extent and with the frequency that he used to engage in them before the incident. We conclude that the jury's award of $3.4 million for future pain and mental anguish is not excessive. *See Figueroa*, 318 S.W.3d at 62 (noting that damages for pain and suffering are "necessarily speculative" and that each case should be judged on own facts); *Tagle*, 155 S.W.3d at 518 (stating that pain and suffering is "not subject to precise mathematical calculations or objective analysis and is particularly within the province of the jury to resolve and to determine appropriate amounts").

### E. Future Physical Impairment

Finally, Diamond Offshore challenges the jury's $1.7 million award for future physical impairment as excessive.

One of the primary considerations in awarding damages for future physical impairment is the plaintiff's loss of enjoyment of life. *See Pardue*, 186 S.W.3d at 18. Here, Williams explicitly testified:

> I am, in fact, hurt real bad. I hurt on a daily [basis]. . . . I know I feel terrible. Just doing the little things I do hurts me. I can't enjoy life like I used to. I mean, I was always active. I've had motorcycles and race cars and boats and jet skis. I was [into] everything. You know, a

lot of that is—I still—still do those things—or some of those things but not—not at the extent I used to.

Williams testified that he tries to keep up with his favorite activities, such as working with his excavator, repairing vehicles, hunting, being outdoors with his daughter, and going to his daughter's softball games, but that it causes him pain to engage in these activities and that he can no longer do these activities like he used to do. Several of his friends and family members testified and related specific examples, and they also testified concerning the changes in Williams's personality as a result of being unable to participate in and enjoy life the way he used to do. Williams also presented medical testimony that his condition is likely to get progressively worse as he ages, further limiting his ability to be active.

Testimony at trial indicated that Williams, who was forty-four at the time of trial, was expected to live another thirty-four to thirty-five years. Diamond Offshore has again cited case law in which plaintiffs with "debilitating injuries" did not receive as high an award for future physical impairment as Williams did, but, again, these cases do not support the proposition that the jury's award in this case was excessive. We conclude that, in this case in which there is clear evidence that Williams cannot live his life the way that he used to, the jury's award of $1.7 in damages for future physical impairment is not excessive.

We overrule Diamond Offshore's third issue.

## Conclusion

We affirm the judgment of the trial court.

Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Jennings and Keyes.

Justice Keyes, dissenting.

# Tab E
## Court of Appeals Dissenting Opinion



In The

# Court of Appeals

For The

# First District of Texas

---

## NO. 01-13-01068-CV

---

## DIAMOND OFFSHORE SERVICES LIMITED AND DIAMOND OFFSHORE SERVICES COMPANY, Appellants

## V.

## WILLIE DAVID WILLIAMS, Appellee

---

### On Appeal from the 164th District Court
### Harris County, Texas
### Trial Court Case No. 2011-31922

---

### DISSENTING OPINION

I respectfully dissent, and I urge the Texas Supreme Court to take this case to establish the criteria for exclusion of a surveillance video in the Texas courts under Texas Rule of Civil Procedure 403, which governs the admissibility of

evidence whose probative value is allegedly substantially outweighed by the danger of unfair prejudice or needless cumulativeness.

In this case, the trial court refused to admit into evidence a surveillance video showing the plaintiff, Willie David Williams, performing multiple physical tasks while at the same time seeking recovery for total and permanent disability allegedly caused by an on-the-job injury at Diamond Offshore. The jury awarded Williams $8.5 million in damages. The panel majority affirms. Because I believe the trial court's suppression of this probative evidence was prejudicial to Diamond Offshore, caused an unfair trial, and probably caused the rendition of an improper judgment, I would hold that the trial court abused its discretion. I would reverse the judgment of the trial court and remand for a new trial.

## Background

Williams, a long-time offshore rig worker, served as a mechanic on an offshore oil rig located off the coast of Egypt that was owned and operated by Diamond Offshore. On January 7, 2008, he worked for approximately thirty to forty minutes repairing a set of elevators on the rig before he injured his back. When his back pain continued unabated after returning home from the rig, Williams saw Dr. Patrick Barrett, an orthopedic surgeon.

An MRI performed in December 2005 as part of pre-employment screening had indicated that Williams had bulging discs and "[d]egenerative disc disease of

2

the lumbar spine" two years before his back injury on the Diamond Offshore rig. In addition, Williams informed Dr. Barrett that he had also injured his back on a rig in 2006 and that he had had ongoing back pain since that injury. Dr. Barrett ultimately performed two surgeries on Williams' back: a micro discectomy in April 2008 and a fusion surgery in February 2009. Williams contends that, as a result of his injury on the Diamond Offshore rig, he is totally disabled and unable to return to work.

Before trial, Diamond Offshore indicated its intent to offer into evidence a post-incident surveillance video of Williams taken by an investigator it had hired. The video, which was slightly over an hour long, contained footage of Williams working outside his home on three consecutive days in December 2012, nearly five years after his injury occurred at Diamond Offshore. The video depicted Williams performing such tasks as repairing a four-wheeler vehicle, operating a mini-excavator, and performing other activities involving bending and lifting.

Williams sought to exclude the video, arguing that the video lacked any impeachment value because he had never claimed that he could not do the tasks depicted in the video. He also argued that the prejudicial effect of the video outweighed any probative value that the video might have and that the video could not be admitted as substantive evidence because "such a minimal and random view

of plaintiff's life cannot possibly be a fair representation of his disabilities or abilities since his injury."

In response, Diamond Offshore argued that the video demonstrated Williams, "with evidence ease," "bending, stooping, reaching, and throwing as he manually picks up debris on his property and puts it in the back of a trailer. He gets back in his trailer, hauls it off. He's apparently disposing of stuff." It contended that the video was admissible both as impeachment evidence and as substantive evidence relevant to Williams' post-incident physical condition, which went to the heart of all of Williams' future damages claims.

The trial court agreed with Williams and excluded the surveillance video, informing the parties that Diamond Offshore could "keep [the video] in your reserve bank for impeachment, and that's it. So, if [Williams] opens the door, then we'll take a look at it." The trial court did not view the video either then or subsequently.

Diamond Offshore sought admission of the surveillance video on several occasions throughout trial, arguing that the testimony of Dr. Jose Rodriguez, an orthopedic surgeon who reviewed Williams' medical records but did not treat Williams, and the testimony of Williams himself concerning the activities that Williams could perform after the incident were both contradicted by the contents of the video and that Diamond Offshore should be allowed to impeach the

4

witnesses with the video. Williams, for example, testified that he could still perform activities such as bending over, sitting and standing for long periods of time, working on cars, and using his excavator, although he was limited in the amount of time that he could do each activity, that his "back hurts constantly," and that it hurt him to do the activities that he used to do before his injury. On each occasion on which Diamond Offshore sought to admit the surveillance video, the trial court refused to admit it without viewing it.

The jury ultimately apportioned 30% fault for Williams' injury and damages to Diamond Offshore, 60% fault to the vessel Ocean Lexington, and 10% fault to Williams. The jury's verdict included, among other amounts, awards of $3.4 million for future physical pain and mental anguish, $2.2 million in loss of future earning capacity, and $1.7 million in future physical impairment. After reducing the jury verdict by 10% due to the fault apportioned to Williams and after applying a nearly-$200,000 offset, the trial court entered judgment against Diamond Offshore in the amount of $8,512,068.

## Admission of Surveillance Video

In its first issue, Diamond Offshore contends that the trial court erred in excluding the post-incident surveillance video of Williams that it proffered. I agree with Diamond Offshore that the trial court should have admitted the

surveillance video and that the court's failure to do so resulted in an unfair trial, probably caused the rendition of an improper judgment, and requires reversal.

## A. *Standard of Review*

Under the Texas Rules of Evidence, "[a]ll relevant evidence is admissible" unless otherwise provided by constitution, statute, or rule. TEX. R. EVID. 402, 61 TEX. B.J. 374, 377 (Tex. & Tex. Crim. App. 1998, amended 2015) (hereinafter, "TEX. R. EVID. 402").[1] "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." TEX. R. EVID. 401, 61 TEX. B.J. 374, 377 (Tex. & Tex. Crim. App. 1998, amended 2015). Here, video evidence showing Williams performing the types of activities he claims to have been permanently disabled from performing by his injury at Diamond Offshore is clearly highly relevant to the extent of the injury he claims to have suffered and the amount of damages appropriate to compensate him for his injuries suffered at Diamond Offshore.

Williams argues, however, that this evidence is inadmissible under Rule 403, which provides, in relevant part, that "[a]lthough relevant, evidence may be

---

[1] Effective April 1, 2015, the Texas Supreme Court adopted amendments to the Texas Rules of Evidence. 78 TEX. B.J. 42, 42 (Tex. 2015). The revisions to Rules of Evidence 401, 402, and 403 were stylistic and do not affect the substance of the rules. I cite the old rules, which were the versions in effect at the time of the trial in this case.

excluded if its probative value is substantially outweighed by the danger of unfair prejudice ... or by ... needless presentation of cumulative evidence." TEX. R. EVID. 403, 61 TEX. B.J. 374, 377 (Tex. & Tex. Crim. App. 1998, amended 2015) (hereinafter, "TEX. R. EVID. 403"). Under Rule 403, a trial court has broad discretion to exclude evidence "if it creates undue prejudice, [if it] distracts the jury from the main issue or issues, if it consumes an undue amount of time, or if it unfairly surprises the proponent's adversary." *TCA Bldg. Co. v. Nw. Res. Co.*, 922 S.W.2d 629, 637 (Tex. App.—Waco 1996, writ denied); *Charter Med. Corp. v. Miller*, 605 S.W.2d 943, 953 (Tex. Civ. App.—Dallas 1980, writ ref'd n.r.e.).

Rule 403, by its plain wording, requires that the trial court conduct a balancing test "to determine whether or not the proffered evidence is admissible." *TCA Bldg. Co.*, 922 S.W.2d at 637; *John Deere Co. v. May*, 773 S.W.2d 369, 373 (Tex. App.—Waco 1989, writ denied). "[T]estimony is not inadmissible on the sole ground that it is 'prejudicial' because in our adversarial system, much of a proponent's evidence is legitimately intended to wound the opponent." *Bay Area Healthcare Grp., Ltd. v. McShane*, 239 S.W.3d 231, 234 (Tex. 2007) (per curiam). Evidence is inadmissible under Rule 403 only if its probative value is "substantially outweighed by the danger of *unfair* prejudice." *See id.* (emphasis in original); *see also PPC Transp. v. Metcalf*, 254 S.W.3d 636, 643 (Tex. App.— Tyler 2008, no pet.) (holding that trial court abused its discretion in excluding

7

relevant, probative evidence when prejudicial effect of evidence did not substantially outweigh probative value). Evidence is unfairly prejudicial if it has an "undue tendency to suggest [a] decision on an improper basis, commonly, though not necessarily, an emotional one." *Cook v. Sabio Oil & Gas, Inc.*, 972 S.W.2d 106, 111 (Tex. App.—Waco 1998, pet. denied); *see also Olivarez v. Doe*, 164 S.W.3d 427, 430 (Tex. App.—Tyler 2004, pet. denied) ("Evidence is unfairly prejudicial if it would tend to persuade a jury to determine an issue on an improper basis such as emotion or bias.").

The admission or exclusion of evidence "is committed to the trial court's sound discretion." *Tex. Dep't of Transp. v. Able*, 35 S.W.3d 608, 617 (Tex. 2000). A trial court does not abuse its discretion simply because the appellate court would have ruled differently under the same circumstances. *See E.I. DuPont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995). However, a trial court does abuse its discretion when it acts without reference to any guiding rules or principles. *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 754 (Tex. 1995).

For the exclusion of evidence to constitute reversible error, the complaining party must demonstrate: (1) that the trial court committed error and (2) that the error was reasonably calculated to, and probably did, cause rendition of an improper judgment. *See Hahn v. Love*, 394 S.W.3d 14, 34 (Tex. App.—Houston [1st Dist] 2012, pet. denied). "[A] successful challenge to evidentiary rulings

8

usually requires the complaining party to show that the judgment turns on the particular evidence excluded or admitted." *Able*, 35 S.W.3d at 617. Thus, an appellate court generally does not reverse a judgment based on an erroneous ruling on admissibility when the evidence in question is cumulative and is not controlling on a material issue dispositive to the case. *Id.* In determining if the excluded evidence probably resulted in the rendition of an improper judgment, the appellate court reviews the entire record. *Id.*; *Hahn*, 394 S.W.3d at 35.

### B. *Admission of Surveillance Videos*

Although Texas courts have admitted post-accident surveillance videos offered by defendants to demonstrate the activities and capabilities of allegedly injured plaintiffs in personal injury cases, no Texas case has specifically addressed the criteria for the admissibility of surveillance videos under Rule 403. *See Huston v. United Parcel Serv., Inc.*, 434 S.W.3d 630, 642 (Tex. App.—Houston [1st Dist.] 2014, pet. denied) (considering post-accident surveillance video in factual sufficiency review of damages award where appellant plaintiff did not challenge admissibility of video on appeal); *Nat'l Freight, Inc. v. Snyder*, 191 S.W.3d 416, 424 (Tex. App.—Eastland 2006, no pet.) (upholding exclusion of six-second portion of surveillance video in which plaintiff made obscene gesture where appellant did not challenge trial court's admission of remainder of video); *Dunn v. Bank-Tec S.*, 134 S.W.3d 315, 329 & n.7 (Tex. App.—Amarillo 2003, no pet.)

9

(addressing whether surveillance video had been properly authenticated and stating that appellants had waived any argument that prejudicial effect of video substantially outweighed video's probative value); *Home Ins. Co. v. Garcia*, 74 S.W.3d 52, 56–57 (Tex. App.—El Paso 2002, no pet.) (considering surveillance video in factual sufficiency review where plaintiff did not challenge admissibility of video).

Federal courts and other state jurisdictions *have*, however, addressed the exclusion of surveillance videos showing a personal injury plaintiff performing tasks while also claiming damages for disability under circumstances virtually identical to those in this case. In my view, the analysis employed by those courts is applicable here and determinative of this case under the balancing test set out in Rule 403 and employed by Texas courts to determine unfairly prejudicial evidence. I would hold that the trial court improperly excluded the surveillance video under Rule 403 and, thereby, abused its discretion, resulting in reversible error.

### *1. Admissibility of surveillance videos as substantive, probative evidence*

Williams argues that the surveillance video was not admissible because it was not substantive evidence, lacked impeachment value, and was more prejudicial than probative. I disagree with all of these objections. I would follow the courts in other jurisdictions that have weighed the prejudicial effect of a surveillance video vis-à-vis its probative value in order to determine its admissibility under Rule 403.

10

In *Chiasson v. Zapata Gulf Marine Corp.*, 988 F.2d 513 (5th Cir. 1993), for example, the Fifth Circuit Court of Appeals considered whether a post-accident surveillance video constituted substantive evidence in addition to merely impeachment evidence in a personal-injury case. The Fifth Circuit defined "substantive evidence" as evidence that "is offered to establish the truth of a matter to be determined by the trier of fact." *Id.* at 517. The plaintiff, Chiasson, claimed that as a result of her injury she had suffered "great physical and mental pain and anguish," and she sought damages to "loss of enjoyment from the activities of her normal life." *Id.* The court noted that "the severity of [Chiasson's] pain and the extent to which she has lost the enjoyment of normal activity are among the key issues a jury must decide in calculating her damages." *Id.* Thus, it concluded that evidence that "would tend to prove or disprove such losses" should be considered "substantive" evidence. *Id.*

The court also observed that Chiasson had testified at trial that she was able to engage in her usual daily activities, but that she could not do so "for too long of a period of time" before she started to feel pain. *Id.* The court doubted whether the surveillance video at issue "discredits her testimony at all," but it still ultimately held that, not only did the video constitute substantive evidence, instead of merely impeachment evidence, but that the importance of the video was "obvious." *Id.* at 517–18. The Fifth Circuit remanded the case for a new trial,

11

ruling that because the video was "at the very least in part substantive," it should have been disclosed to Chiasson prior to trial and that the trial court abused its discretion in admitting the video without requiring Zapata Gulf to disclose it to Chiasson.[2] *Id.*

The Fifth Circuit affirmed its *Chiasson* reasoning in *Baker v. Canadian National/Illinois Central Railroad*, 536 F.3d 357, 369 (5th Cir. 2008), in holding that the trial court did not abuse its discretion by admitting a surveillance video the plaintiff had objected to as unfairly prejudicial. Baker alleged that his injuries and post-accident limitations included "the inability to count money, make change, or be in crowds." *Id.* Illinois Central offered a surveillance video that depicted Baker "spending long periods of time in casinos." *Id.* Baker argued, among other things, that the video should be excluded as unfairly prejudicial because it "informed jurors that he engaged in activities many people consider immoral." *Id.* The Fifth Circuit held, however, pursuant to *Chiasson*, that this video constituted substantive evidence. *Id.* The court also noted that the issue of Baker's "post-accident quality of life was hotly disputed" and that Baker's witnesses "testified in detail regarding the allegedly severe post-accident limitations Baker face[d]." *Id.* The court

---

[2] *Chiasson* involved a local rule of the Eastern District of Louisiana which generally required parties to list the exhibits to be presented at trial. *See Chiasson v. Zapata Gulf Marine Corp.*, 988 F.2d 513, 515 (5th Cir. 1993). The question before the Fifth Circuit was whether the surveillance video was solely impeachment evidence or whether it was also substantive evidence, which would have required it to be disclosed to Chiasson before trial. *Id.* at 514.

12

ultimately concluded that the probative value of the video that contradicted Baker's witnesses "weighs heavily" against the prejudicial effect of "a hypothetical juror's moral aversion to gambling." *Id.* The court held that the trial court did not abuse its discretion by admitting the surveillance video. *Id.*

In circumstances almost identical to those in this case, the Mississippi Supreme Court likewise addressed whether the trial court abused its discretion in excluding a post-accident surveillance video of the plaintiff, who had injured her back, riding rollercoasters at a Six Flags amusement park. *James v. Carawan*, 995 So. 2d 69, 75–78 (Miss. 2008). In concluding that the trial court abused its discretion in excluding the video, the court noted that "[a] reasonable juror could conclude that the Six Flags video casts doubt on the severity of Carawan's injuries," that "a reasonable juror might conclude that the Six Flags video has a tendency to show that Carawan may not have been as weakened or vulnerable as she indicated to her doctors or as her medical treatments suggest," that "[t]he video also could have been relevant to whether or not she truly had been unable to work," that the video was relevant to the question of appropriate damages for pain and suffering, and that "this video might shed doubt upon the merits of Carawan's case as a whole." *Id.* at 76. The court concluded,

> We already have determined that the video was relevant. Aside from its damaging effect to Carawan's case, we are unable to determine how its admission would unfairly prejudice Carawan. A reasonable juror could understand that the video calls into question the severity of

13

Carawan's injuries prior to July 29, 2003, and therefore challenged the necessity of at least some of her medical expenses, the validity of her lost wages, the extent of her pain and suffering, and the legitimacy of her entire claim.

*Id.* at 77–78. In this case, this Court, like the trial court in *James*, reaches exactly the opposite conclusion on almost identical facts.

Here, Williams sought damages for, among other things, future pain and mental anguish, loss of future earning capacity, and future physical impairment, which implicated "loss of enjoyment of life." *See Doctor v. Pardue*, 186 S.W.3d 4, 18 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) (stating that jury may consider "loss of enjoyment of life" as factor in assessing damages for physical impairment). To support his contention that a proper award for lost future earning capacity equaled over $2.2 million, he presented testimony that he would be unable to work in any capacity in the future due to his physical limitations and his chronic pain caused by his injury while repairing elevators at Diamond Offshore for thirty to forty-five minutes. During his testimony, Williams acknowledged that he could perform the activities depicted in the surveillance video, although he emphasized that he could only engage in these activities for short periods of time before he felt pain and that he would be in pain later after engaging in these activities. Williams' friends and family members testified to essentially the same facts.

Admission of the surveillance video depicting Williams performing various activities outside his house over three consecutive days in December 2012,

14

including using his excavator to haul away scrap materials and repairing a vehicle, would have allowed the jury to judge for itself the credibility of Williams' and his friends and family members' testimony and to determine upon a fuller basis "the necessity of at least some of [his] medical expenses, the validity of [his] lost wages, the extent of [his] pain and suffering, and the legitimacy of [his] entire claim." *See James*, 995 So. 2d at 78. I would conclude that it was thus highly probative.

Moreover, like the Mississippi Supreme Court in *James*, I am unable to determine in this case how the admission into evidence of a surveillance video that "calls into question the severity of [Williams'] injuries . . . and therefore challenge[s] the necessity of at least some of [his] medical expenses, the validity of [his] lost wages, the extent of [his] pain and suffering, and the legitimacy of [his] entire claim" would have unfairly prejudiced Williams. *See id.* In my view, the surveillance video in this case legitimately calls into question the extent and severity of Williams' injuries, the extent to which he can still engage in activities that he enjoys, the extent to which he can still work, the degree to which he has lost "enjoyment of life," and the overall legitimacy of his claim for future damages. There is no prejudicial effect from the surveillance video other than the video's direct contradiction of Williams' and his experts' testimony that Williams cannot perform the tasks of a mechanic due to his work-related injury. Thus, any

15

prejudice to Williams' claim arises from the probative value of the video, not from the tendency of the video to evoke an improper emotional or biased response from the jury. *See Olivarez*, 164 S.W.3d at 430; *Cook*, 972 S.W.2d at 111. The video is both maximally probative and minimally prejudicial. *See James*, 995 So. 2d at 78.

These are not the only cases in which courts have performed the same balancing test under Rule 403 that the trial court failed to perform in this case and that consequently have found a surveillance video admissible. *See, e.g., Zegarelli v. Hughes*, 814 N.E.2d 795, 798 (N.Y. 2004) (holding that trial court committed reversible error in excluding post-accident videotape of injured plaintiff shoveling snow after plaintiff testified that he took "two or three swipes" of parking area with shovel); *Sweet v. Pace Membership Warehouse, Inc.*, 795 A.2d 524, 528 (R.I. 2002) (reversing trial court's decision to exclude post-accident surveillance video and directing trial court, on remand, to evaluate admissibility of video under Rule 403).

Like the foregoing courts, I would conclude that admitting the surveillance video would have had no prejudicial effect "[a]side from its damaging effect to [Williams'] case." *James*, 995 So. 2d at 78. Therefore, I would conclude that the prejudicial effect of the video does not substantially outweigh the video's probative value; that the video is clearly admissible, relevant evidence under Rule 402, and the trial court erred in excluding it. *See* TEX. R. EVID. 402 ("All relevant evidence

16

is admissible, except as otherwise provided by Constitution, by statute, by these rules, or by other rules prescribed pursuant to statutory authority."); TEX. R. EVID. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ."). Yet neither the trial court nor the majority performed the balancing test required by Rule 403 and applied by these courts in other jurisdictions to determine the admissibility of surveillance videos and by courts in this jurisdiction generally to determine the admissibility of evidence objected to on Rule 403 grounds. *See Baker*, 536 F.3d at 369; *Chiasson*, 988 F.2d at 517–18; *James*, 995 So. 2d at 76; *cf. Bay Area Healthcare Grp.*, 239 S.W.3d at 234; *PPC Transp.*, 254 S.W.3d at 643; *TCA Bldg. Co.*, 922 S.W.2d at 637.

I agree not only with the judgment of the previous courts that have addressed the issue of the admissibility of surveillance videos, and with the Texas courts that have addressed the mandate of Rule 403, but also with the courts' holding that a trial court is required to perform a balancing test to determine whether a surveillance video is unfairly prejudicial and therefore subject to exclusion under Rule 403; and I would hold, like those courts, that a trial court that excludes relevant and material evidence without performing this test and making a rational determination that the evidence is unfairly prejudicial abuses its discretion. *See, e.g., PPC Transp.*, 254 S.W.3d at 643.

17

I therefore deeply disagree with the majority's conclusion that a trial court has absolute discretion to rule a video inadmissible without viewing it or weighing its tendency to persuade a jury on an improper basis such as emotion or bias. *See Olivarez*, 164 S.W.3d at 430; *Cook*, 972 S.W.2d at 111. The majority merely assumes limitless discretion on the part of the trial court and this appellate court itself to make their own subjective determinations as to whether clearly material surveillance video evidence is admissible without performing the balancing test required by Rule 403 and without even viewing the video. In my view, this is error.

In support of his argument, Williams cites cases from other jurisdictions holding that a trial court did not abuse its discretion in excluding post-accident surveillance videos. Tellingly, however, in none of these cases did the appellate court ignore the requirements of Rule 403 in determining the admissibility of the surveillance video. Rather, like the preceding cases, and unlike the majority opinion in this case, Williams' cases all demonstrate that the appellate court *did* perform the balancing test required by Rule 403 to determine whether the trial court abused its discretion in applying that rule but excluded the surveillance video for other reasons, such as the unreliability of the evidence or its failure to show what the defendant claimed it showed.

For example, in one case from Illinois, the appellate court focused on the fact that the surveillance videotapes were edited and only showed the plaintiff outside, thus, in its view, "giv[ing] the impression that [the] plaintiff's activity is constant," and the fact that the plaintiff "can sustain labor-intensive activities over a period of time without rest or without experiencing pain," and it concluded that the danger of unfair prejudice outweighed the probative value of the surveillance videos. *See Carroll v. Preston Trucking Co.*, 812 N.E.2d 431, 435–36 (Ill. App. Ct. 2004); *see also Donnellan v. First Student, Inc.*, 891 N.E.2d 463, 478 (Ill. App. Ct. 2008) (relying on *Carroll* to uphold exclusion of surveillance video and stating, "Despite defendant's contention that [the videographer] testified that the video was not edited to demonstrate only the period plaintiff was working and that he filmed every moment that he could, the video leaves the impression that plaintiff was working for extended periods of time").

Williams also cites *Quinn v. Wal-Mart Stores, Inc.*, 774 So. 2d 1093 (La. Ct. App. 2000), in which the Louisiana appellate court concluded that the trial court had properly excluded a post-accident surveillance video when the injured plaintiff testified that she could perform the activities depicted in the video and the video did "not fairly indicate whether [the plaintiff] did experience pain after engaging in these activities." *Id.* at 1098. The court stated that "showing these tapes to the jury without context or explanation" could "create a prejudicial impression on the jury

19

that outweighs any probative value they may have to impeach [the plaintiff's] testimony." *Id.*

Likewise, in this case, Williams contends that the prejudicial effect of the "heavily edited" video substantially outweighs any probative value, citing *Carroll, Donnellan,* and *Quinn* as support for this contention. He argues that the video "paints a misleading picture of [his] condition" by not giving "fair representation of the fact that Williams could do [the activities depicted in the video] only for short stretches, of the pain medication he needed, or of the suffering he endured later."

Williams' concerns regarding unfair prejudice, however, are misplaced. His contention that the surveillance video, which contains footage from multiple days edited together onto one video, gives the impression that he was engaged in continual activity could easily have been dispelled by cross-examining the videographer, if he or she was the sponsoring witness, regarding the length of time the videographer filmed the plaintiff, where edits or cuts in the video were made, and whether and for how long the plaintiff engaged in activity outside the view of the camera. Indeed, Diamond Offshore had its videographer, Don Soutillo, available to testify, and, had the trial court admitted the surveillance video, Williams would have had the opportunity to cross-examine Soutillo concerning the circumstances under which the video was made. Moreover, the video plainly

showed, via time and date-stamps, the exact period of time over which Williams was shown performing the activities he claims he could not perform without pain and difficulty. Williams himself could have addressed the issues of whether he needed pain medication after engaging in the activities depicted in the surveillance video and whether he suffered pain as a result of participating in the activities depicted. Thus, any potential prejudicial effect from showing an edited video could have been minimized.

It is especially hard to see under these circumstances, including the potential for cross-examination, how Williams would have been *unfairly* prejudiced if the jury had been allowed to see the surveillance video. And the mere fact that the video was prejudicial to Williams' account of his permanent disability was not, by itself, grounds for exclusion, for, as the Texas Supreme Court stated in *Bay Area Healthcare Group*, "[T]estimony is not inadmissible on the sole ground that it is 'prejudicial' because in our adversarial system, much of a proponent's evidence is legitimately intended to wound the opponent." 239 S.W.3d at 234.

I would adopt the Fifth Circuit's reasoning in *Chiasson* and *Baker* and the Mississippi Supreme Court's reasoning in *James*, as well as the reasoning of the Texas courts that have construed Rule 403, and I would hold that the post-accident surveillance video proffered by Diamond Offshore constitutes substantive evidence relevant to the ultimate issues in this case—the amount of damages to which

Williams is entitled—and that its probative value substantially outweighed any prejudicial effect it might have had on the evidence in this case, and certainly any *unfair* prejudicial effect. *See Baker*, 536 F.3d at 369; *Chiasson*, 988 F.2d at 517 (holding that post-accident surveillance video, in addition to having impeachment value, is also "at the very least in part substantive" evidence); *James*, 995 So. 2d at 77; *see also Bay Area Healthcare Grp.*, 239 S.W.3d at 234; *PPC Transp.*, 254 S.W.3d at 643. Thus, it was error to exclude it.

The error was compounded by the trial court's failure even to view the video, much less to subject it to the balancing required by Rule 403. *See Bay Area Healthcare Grp.*, 239 S.W.3d at 234; *PPC Transp.*, 254 S.W.3d at 643; *TCA Bldg. Co.*, 922 S.W.3d at 637; *see also Baker*, 536 F.3d at 369; *James*, 995 So. 2d at 76. In my view, the trial court's decision to exclude the video can only have been made without reference to any guiding rules or principles, and its exclusion was, therefore, an abuse of discretion. *See Alvarado*, 897 S.W.3d at ;754.

### 2. Authentication of video

Williams also argues, however, that the trial court's ruling excluding the surveillance video can be upheld because Diamond Offshore did not establish the authenticity of the video. I find this argument likewise unavailing.

Authentication concerns whether the item of evidence in question "is what its proponent claims." *See* TEX. R. EVID. 901(a), 61 TEX. B.J. 374, 397 (Tex. &

Tex. Crim. App. 1998, amended 2015) ("The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."); *Dunn*, 134 S.W.3d at 329 ("[T]he admissibility of a video is conditioned upon its identification by a witness as an accurate portrayal of the facts, and on verification by that witness or a person with knowledge that the photograph is a correct representation of such facts."). In *Dunn*, the Amarillo Court of Appeals held that the plaintiff could authenticate a surveillance video introduced during his cross-examination by agreeing that he was the person filmed and by "describ[ing] the things he was doing in [the video]." *Id.* at 329. The court concluded that Dunn's testimony "effectively supplied the predicate for the video's admission by revealing that its content was an accurate portrayal of the acts he was doing" and affirmed admission of the video. *Id.*

Here, Williams agreed, both in a pre-trial written brief and at a pre-trial hearing, that the proffered video depicted him performing various outdoor activities. He argued that the trial court ought to exclude the video *not* on authentication grounds but (1) because he would testify that he could do the activities depicted in the video, albeit for short periods of time only and that he would be in pain later, and thus the video did not constitute proper impeachment evidence, and (2) because the video did not fairly depict his post-injury abilities in

23

that it did not show that he needed rest and it did not reflect his pain. In making these arguments to support exclusion of the surveillance video, Williams conceded that he was the person depicted in the video and that the video accurately portrayed the acts that he was doing, although he argued that the way in which the video depicted these acts was "misleading," thus "effectively supply[ing] the predicate for the video's admission by revealing that its content was an accurate portrayal of the acts he was doing." *See Dunn*, 134 S.W.3d at 329.

I would conclude, therefore, that the trial court's ruling excluding the video cannot be supported on authenticity grounds. *See* TEX. R. EVID. 901(a).

### 3. Cumulative effect of video

Lastly, Williams argues that the trial court appropriately excluded the video because it was cumulative of his testimony that he could perform the acts depicted in the video. *See* TEX. R. EVID. 403.

Rule 403 allows trial courts to exclude relevant evidence if its probative value is substantially outweighed by a danger of "needless presentation of cumulative evidence." *Id.* However, as Diamond Offshore points out, the Texas Supreme Court has recently noted, in a spoliation of evidence context, the "differences in kind and quality between" evidence such as testimony and visual evidence, such as a surveillance video. *See Brookshire Bros., Ltd. v. Aldridge*, 438 S.W.3d 9, 22 (Tex. 2014). The court observed that

24

> [A] spoliating party might argue that no prejudice resulted from spoliation of a video of an incident because there is also eyewitness testimony regarding the incident. But many of the inherent problems with such testimony—inaccurate memory, poor eyesight, bias, etc.— are simply not present with a video recording. Again, a picture is often worth a thousand words.

*Id.; see also In re K.Y.*, 273 S.W.3d 703, 710 (Tex. App.—Houston [14th Dist.] 2008, no pet.) ("[V]isual evidence has significant probative value apart from testimonial evidence on the same subject.").

There is a qualitative difference between Williams' testimony at trial that he could perform activities for a short period of time, but that it hurt him to do so, and a video recording of Williams performing the same activities unaware that he is being filmed and with no incentive to exaggerate the extent of his injuries. Thus, the video is not cumulative. Without the video there is nothing to show that Williams could, in fact, perform the tasks the video showed him performing, and how he performed those tasks, placing squarely before the sight of the jury the credibility of Williams' testimony that he could perform these tasks only with pain and difficulty. Thus, the surveillance video is not merely duplicative of other testimony but highly probative with respect to the extent of Williams' injury at Diamond Offshore to rebut interested testimony favorable to Williams' case.

I would conclude that the surveillance video proffered by Diamond Offshore was not cumulative of Williams' testimony. Instead, it had significant probative

25

value apart from any testimonial evidence on the same subject. *See Brookshire Bros.*, 438 S.W.3d at 22; *In re K.Y.*, 273 S.W.3d at 710.

### 4. Harm analysis

For the foregoing reasons, I would hold that the trial court erred in excluding the proffered surveillance video from the evidence, and I would turn to whether the exclusion of the surveillance video constituted reversible error. *See Hahn*, 394 S.W.3d at 34 (stating that, to constitute reversible error, appellant must demonstrate that error was reasonably calculated to, and probably did, cause rendition of improper judgment). I would hold that it probably did.

As stated above, Williams sought damages for, among other things, future pain and mental anguish, loss of future earning capacity, and future physical impairment. Williams presented testimony from a number of witnesses that he could no longer be employed in any job, even one that involved light or sedentary work, due to his chronic pain and physical limitations. He presented testimony that he could no longer do the activities that he used to enjoy to the extent that he could before his injury due to his chronic pain from his injury; and he testified that, when he did engage in those activities, he could do so only for a short period of time and that it hurt him to do so. He testified that, after the injury, he could no longer enjoy life the way he used to do. The jury credited this evidence and awarded Williams, a long-time offshore rig worker who had a history of degenerative changes in his

26

back, just over $8.5 million in damages, including $3.4 million in future physical pain and mental anguish, $2,254,275 in loss of future earning capacity, and $1.7 million in future physical impairment.

The proffered surveillance video goes to the heart of each of Williams' damages questions. The video depicts Williams using his excavator, picking up debris and scrap materials, picking up large tires, repairing vehicles, and bending and stooping to perform these activities. The video thus calls into question his experts' contentions that he could not perform any of the work of a mechanic after his injury at Diamond Offshore and that he cannot perform any work in the future due to his chronic pain. The video also casts doubts on the extent of Williams' pain and the degree to which his injury has affected his ability to enjoy life, in that it would have enabled the jury to observe Williams as he performed these activities, implicating the future physical impairment award.

Because the trial court failed even to view the surveillance video or to perform the balancing test required by Rule 403, and thus excluded it arbitrarily and without reference to any guiding rules of principles, and because it was highly probative and not unfairly prejudicial, and therefore clearly admissible under the plain language of Rule 403 and controlling and persuasive authority, I would hold that the trial court clearly abused its discretion in excluding the surveillance video from evidence.

27

I would also conclude, based on the foregoing facts and law, that Diamond Offshore has established that the exclusion of the surveillance video was "reasonably calculated to, and probably did, cause the rendition of an improper judgment." *Hahn*, 394 S.W.3d at 34; *see also James*, 995 So. 2d at 78 (holding that exclusion of surveillance video affected defendant's "substantial right to present his defense" and thus constituted reversible error). I would therefore hold that the trial court committed reversible error when it excluded Diamond Offshore's proffered surveillance video.

I would sustain Diamond Offshore's first issue.

## Conclusion

I would reverse the judgment of the trial court and remand the case for a new trial.

Evelyn V. Keyes
Justice

Panel consists of Chief Justice Radack and Justices Jennings and Keyes.

Justice Keyes, dissenting.

28